IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| Christopher Jarvis, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:17-cv-396-WKW-SRW |
| T. Britt Taylor, Norman Chandler, | § | |
| and James R. Johnson, | § | |
| | § | |
| Defendants | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW Plaintiff, Christopher Jarvis, and for his Complaint against Defendants T. Britt Taylor, Norman Chandler, and James R. Johnson (the "Individual Defendants") and Taylor Chandler, LLC ("Taylor Chandler") respectfully states:

### I. PARTIES

1.  Plaintiff Christopher Jarvis is a resident citizen of the State of Texas.

2.  Defendant T. Britt Taylor is a resident citizen of the State of Alabama.

3.  Defendant Norman Chandler is a resident citizen of the State of Alabama.

4.  Defendant James R. Johnson is a resident citizen of the State of Alabama.

5.  Defendant Taylor Chandler, LLC is an Alabama limited liability company with its principal place of business in Alabama.

### II. JURISDICTION AND VENUE

6.  This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds the sum or value of $75,000, exclusive of

interest and costs, and there is complete diversity of citizenship between the Plaintiffs and the Defendants.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the Individual Defendants reside here and Taylor Chandler does business in the District

## III. FACTS

8. Jade Risk, LLC ("Jade Risk") is a company that forms and manages captive insurance companies. Typically, a captive insurance company is owned by the same persons who own a privately held business (often a family business, professional practice, or family office encompassing several generations). The captive insurance company can enable the business that owns it to finance insurable risks, access the reinsurance market, and in some cases, to elect favorable tax treatment for the underwriting profit allocated to the captive insurance company.

9. Captive insurance transactions typically involve large sums of money and complex regulatory compliance issues. Therefore, the industry is tightly-knit. Reputation, reliability, and highly responsive client service are crucial to maintaining business relationships in the captive insurance market.

10. In 2015 and 2016, the Defendants negotiated with Jarvis, who was then the President of Jade Risk, to purchase the company.[1] The parties entered into a

---

[1] After the purchase, Jade Risk was absorbed into Arsenal Insurance Management, LLC, another company controlled by the individual Defendants. In their post-sale discussions, the parties have used Jade Risk in some contexts and Arsenal in some contexts to refer to the same captives and revenues. For purposes of streamlining this Complaint and avoiding confusion, Plaintiff will continue to refer to Jade Risk in discussing the revenue targets and number of captives under management relevant to the Membership Purchase Agreement and the Employment Agreement, and this use of Jade Risk encompasses and includes all references to Arsenal in the context of these metrics.

Membership Purchase Agreement, attached here as Exhibit A, secured by a Promissory Note, attached here as Exhibit B. Because the value of the company depended in large part on the goodwill built up by Jarvis over time, the parties entered a Restrictive Covenant, attached here as Exhibit C, and further negotiated for Jarvis to enter a contemporaneous Employment Agreement, attached here as Exhibit D, with Taylor Chandler, LLC, a company controlled by the individual Defendants.

11. The sale of Jade Risk took place at a time when regulations governing the captive insurance industry were in flux. As a result, the parties built certain provisions into their agreement that would fairly allocate the risk of changes in the regulatory environment. To account for some of this risk, the parties agreed that, if Jade Risk's revenues between July 1, 2016 and December 31, 2016 were less than $1,010,000 and continued to fail to meet a similar 2017 earnings target, the Promissory Note funding a portion of the Membership Purchase Agreement could be adjusted downward by the difference between Jade Risk's 2016 earnings and the 2016 Revenue Target. Exhibit A at ¶1.3(b). Similarly, the parties agreed Jarvis' $175,000 earnout could be adjusted downward if Jade Risk's revenues in 2016 were less than $1,010,000.[2] Exhibit D at ¶3.1(b), (c), (d).

12. The savings to Defendants from the reductions to the Promissory Note and Jarvis' earnout in the event of a 2016 and 2017 revenue shortfall are significant. It

---

[2] To further account for expected fluctuations in the number of captives under management due to changing regulatory conditions, any bonus compensation would be further contingent on Jade Risk's having at least 36 captives under management. Exhibit D at ¶3.1(b),(c),(d).

has recently become apparent that Defendants are acting intentionally to delay and underreport Jade Risk's performance in order to force such a shortfall and obtain a discount on the agreed purchase price of the Membership Interests.

**A. The Captive Insurance Market Is Vulnerable to Regulatory Changes**

13. To understand the game Defendants are playing, some background on the captive insurance industry is helpful. In 2015 and 2016, several regulatory changes influenced the fortunes of the captive insurance industry. First, on December 18, 2015, the Protecting Americans From Tax Hikes (PATH) Act was signed into law. P.L. 114-113. The PATH Act added new rules limiting favorable tax treatment for captive insurance companies in which the policyholders are related to each other. This regulatory change made it more difficult to use captive insurance companies for estate planning in family businesses. Up until the passage of the PATH Act, this was a relatively common use for captive insurance companies.

14. Then, on February 16, 2016, the IRS included captive insurance companies on its annual "Dirty Dozen" list of "abusive" tax shelters for the second year in a row. While the "Dirty Dozen" list is not authoritative, it is seen in the financial services industry as a clear signal that the IRS intends to examine the listed practices very closely. Captive insurance had been on the 2015 Dirty Dozen list, and its inclusion for the second time in a row on the 2016 list, particularly in the wake of the PATH Act's passage, was an indication to many in the industry that captives would present a far higher regulatory risk profile going forward.

15.     Finally, on November 21, 2016, the IRS issued Notice 2016-66, identifying captive insurance companies as a "Transaction of Interest." Again, the industry took this Notice as an unambiguous warning from the IRS that the regulatory climate would be inhospitable to captives. Cumulatively, these developments caused many captives to restructure or disband entirely.

16.     Nevertheless, many state insurance departements continue to support growth in the captive industry. In particular, on April 28, 2016, Alabama passed HB 270, which updated state law concerning captive insurance companies to offer new tax incentives for domiciling captive insurance companies in the state. Alabama is one of the states where the majority of Jade Risk's captive insurance companies are domiciled. Alabama finished 2016 with more captives, statewide, than in 2015.

**B. The Parties Bargained to Allocate the Risks of Regulatory Change**

17.     While these important rule changes affecting the captive insurance industry were ongoing, Chandler, Taylor, and Johnson purchased membership interests in Jade Risk LLC. Negotiations concerning the sale of Jade Risk began in late 2015 and did not conclude until September of 2016. Because the ongoing changes in the regulatory climate had put the industry in flux during these negotiations, the parties agreed that, if Jade Risk does not reach certain revenue targets in 2016 and 2017, the $750,000 Promissory Note funding a portion of the sale will be discounted by the amount of the 2016 revenue shortfall. Similarly, a significant portion of Jarvis' compensation for his contemporaneous Employment Agreement with Taylor

Chandler is contingent on Jade Risk's meeting its 2016 revenue goal and having at least 36 captive insurance companies under management.

18. These measures were intended to allocate risk between the parties from the volatile regulatory environment surrounding the captive industry in 2016. Chandler, Taylor, and Johnson, however, have intentionally and unreasonably *avoided* hitting the 2016 revenue targets and delayed closing additional captive deals in order to maximized the 2016 shortfall (and thus the offset to the remaining $750,000 purchase price) and artificially depress the number of captives under management for purposes of Jarvis' employment compensation and bonus. The following are just a few of the measures Defendants have used to distort and underreport Jade Risk's performance in 2016:

19. Defendants have blatantly failed to include revenues earned between July 1, 2016 and the actual September closing date of the transaction in their calculation of the revenue target for 2016.

20. Defendants have unreasonably deferred until 2017 the realization and recording of income from captive deals that were closed in 2016 so that these amounts were not counted in determining Jade Risk's 2016 revenues.

21. Defendants have negligently or intentionally delayed closing certain captive insurance deals that were in process at the time the sale of Jade Risk was negotiated, ensuring these deals would not be closed in time to be included in Jade Risk's 2016 revenue numbers or the "Captive Count" described in the Employment Agreement.

22.     Defendants have negligently or intentionally delayed setting up the actual, operational captive insurance companies contemplated by those captive insurance deals that did close in 2016. Delaying the setup of those companies delays income from captive management fees, which would otherwise be counted as part Jade Risk's 2016 revenues.

23.     For clients that actually had active captive insurance companies under management by Jade Risk in 2016, Jade Risk failed to make reasonable efforts to collect accounts receivable until well into 2017, again ensuring that captive management fees and other income would not be realized in time to be included in Jade Risk's 2016 revenues.

24.     Defendants appear to be continuing these tactics into 2017. In Quarter One and Quarter Two of 2017, Defendants continued to delay collection of accounts receivable. Taylor Chandler was also taking weeks to prepare engagement letters for clients who were ready to close their captive management deals—a process that would normally take only a few days.

25.     This deliberate underperformance is not a function of market forces, but a deliberate attempt by Defendants to force a discount in the $750,000 promissory note.

### C. Defendants Terminate Jarvis To Cover Up Their Malfeasance

26.     Contemporaneously with the sale of Jade Risk to Taylor, Chandler, and Johnson, Jarvis entered an employment agreement with Taylor Chandler, LLC, a company controlled by the individual Defendants. Exhibit D. This employment

agreement was part of the consideration for the sale of Jarvis' interest in Jade Risk to the individual Defendants and was described by the parties as an "earnout."

27. Jarvis' compensation by Taylor Chandler, LLC is contingent on the number of captive insurance companies under management by Jade Risk in 2016 and 2017. *Id.* at ¶ 3.1. Because the individual Defendants have intentionally delayed and deferred the creation of captives under management by Jade Risk in order to force a discount in the purchase price of their Membership Interests in Jade Risk, they have adversely affected Jarvis' compensation by Taylor Chandler LLC.

28. The Individual Defendants have never provided an accounting of Jade Risk's actual revenues for 2016 or 2017 to date, nor have they allowed either Jade Risk or Taylor Chandler LLC to provide this information to Jarvis.

29. Well into the first quarter of 2016, Jarvis had received no financial information from Defendants except a bare statement from Norman Chandler that Jade Risk had not made its numbers for 2016 and therefore Jarvis would not be receiving his deferred compensation. When Jarvis asked Norman Chandler for an accounting of Jade Risk's 2016 revenues, Chandler recommended that Jarvis wait a bit longer for the information.

30. Jarvis also expressed concern to Chandler about Jade Risk's lack of diligence in collecting accounts receivable. Following this discussion, and at Chandler's request, Jarvis himself contacted clients with outstanding balances and organized collection of over $100,000 in revenues in May of 2017.

31. Shortly after Jarvis' May, 2017 conversation with Norman Chandler about Jade Risk's financial data and accounts receivable, Taylor Chandler, LLC terminated Jarvis' employment. It was only after Taylor Chandler terminated Jarvis (cutting off his ability to earn additional bonus compensation for captives under management) that the Individual Defendants moved forward with several captive deals that were "waiting on engagement letters" and set up meetings to advance negotiations on multiple additional captive deals that Jarvis had referred to the Defendants for development, but that had been stalled for no apparent reason during Jarvis' tenure with TaylorChandler.

32. Taylor Chandler, LLC allegedly terminated Jarvis for cause, based on Jarvis' attempts to conduct joint marketing for Jade Risk's captive insurance alongside Jarvis' own sale of life insurance. At the time of the Jade Risk sale, however, the parties expressly agreed that Jarvis would continue to sell and manage life insurance policies, independent of any role with Taylor Chandler and notwithstanding the restrictive covenants appurtenant to the sale of Jade Risk. Exhibit C at ¶3; Exhibit D at ¶2.1. The parties knew and understood that Jarvis' life insurance clientele includes many of the same family businesses and financial advisers who were seeking to purchase captive insurance management services from Jade Risk at the time of the sale of Jade Risk to Defendants. Moreover, after the sale, Chandler expressly approved a marketing plan by Jarvis that specifically contemplated Jarvis' marketing life insurance and captive insurance to the same audience for the benefit of Jade Risk

and Jarvis' own life insurance practice. Taylor actually referred a client to Jarvis for the purpose of selling that mutual client life insurance.

33. Given the express carve-out allowing cross-marketing of life insurance services to potential clients of Jade Risk, Exhibit D at ¶ 2.1, Jarvis' attempts to market insurance services could not have been "cause" for termination under the Employment Agreement. *Id.* at ¶ 5.2(b). On information and belief, Defendants used their influence with Taylor Chandler, LLC (a company they own and control) to demand the termination of Jarvis because Jarvis had begun pressing them for information about the financial statements behind Jade Risk's alleged failure to meet its 2016 revenue targets.

34. Defendants' termination of Jarvis did more than simply delay his ability to seek financial information to support Jade Risk's claimed underperformance. Terminating Jarvis has delayed and may have destroyed several captive insurance deals that are currently in negotiation, further artificially depressing Jade Risk's 2017 numbers and damaging Jarvis' personal business relationships.

35. Defendants' actions in cutting Jarvis off from these deals in progress are in keeping with Defendants' course of delaying the closing and setup of all the captives referred by Jarvis since the sale of Jade Risk. Defendants' actions have damaged Jarvis' personal credibility with his clients and contacts in the tightly-knit circles of financial planning for ultra-high net worth individuals. These relationships take many years to develop and only a few bad interactions to destroy.

36. As discussed above, Jarvis' life insurance clients in many cases overlap with Jade Risk's potential clientele. Defendants have intentionally or recklessly damaged Jarvis' reputation with this joint clientele by slow-playing the closing of captive management deals in which Jarvis has played a role, delaying the setup of operational captive insurance companies for clients referred by Jarvis, and now by cutting Jarvis off from deals in progress as part of Defendants' attempt to force Jarvis out of Taylor Chandler, LLC.

37. Defendants' mismanagement of potential captives and active captives referred by Jarvis is intentional or at a minimum reckless. Defendants are not acting with reasonable care to maximize profits and client service for Jade Risk; instead, their management of Jade Risk has been geared towards minimizing the company's apparent revenues in 2016 and 2017, in order to force Jarvis to accept less money than is actually owed under the Membership Purchase Agreement and the earnout contained in Jarvis' Employment Agreement.

38. Defendants' actions have not only prejudiced Jarvis' rights under these Agreements, but have damaged Jarvis' reputation and business relationships.

## IV. CLAIMS FOR RELIEF

**D. Breach of Implied Covenant of Good Faith: Individual Defendants**

39. All of the allegations made in the preceding paragraphs are incorporated by reference as if fully restated here.

40. The conduct of Taylor, Chandler, and Johnson constitutes a breach of the duty of good faith and fair dealing with respect to the Membership Purchase Agreement and Promissory Note.

41. Each Defendant is a party to the Membership Purchase Agreement and Promissory Note with Jarvis.

42. The Membership Purchase Agreement and the Promissory Note are governed by Alabama law and, like all Alabama contracts, contain an implied promise that each party will act in good faith.

43. Each Defendant has intentionally or recklessly acted to frustrate Jarvis' right to the full benefit of the Membership Purchase Agreement and the Promissory Note.

44. Jarvis has been damaged by Defendants' conduct.

**E. Fraudulent Inducement: All Defendants**

45. All of the allegations made in the preceding paragraphs are incorporated by reference as if fully restated here.

46. The conduct of Taylor, Chandler, and Johnson constitutes fraudulent inducement as to Jarvis with respect to the Membership Purchase Agreement, and the conduct of Taylor Chandler constitutes fraudulent inducement as to Jarvis with respect to the Employment Agreement

47. Defendants intentionally or recklessly misrepresented that they would exercise good faith and commercially reasonable efforts to meet the 2016 and 2017 revenue targets identified in the Jade Risk sale documents, including the Membership Purchase Agreement and the Employment Agreement.

48. Jarvis reasonably relied on Defendants' misrepresentations in agreeing to the terms of the Membership Purchase Agreement and Promissory Note.

49. Jarvis has been damaged by Defendants' misrepresentations.

**F.  Negligence: Individual Defendants**

50. All of the allegations made in the preceding paragraphs are incorporated by reference as if fully restated here.

51. Defendants Taylor, Johnson, and Chandler each voluntarily undertook to manage Jade Risk in such a way that it would meet the 2016 and 2017 revenue targets set out in the Membership Purchase Agreement and Promissory Note.

52. Jarvis was an intended beneficiary of the Defendants' performance.

53. Defendants knew that Jarvis was dependent on their performance and reasonably relied on their performance of these duties.

54. Defendants, in voluntarily undertaking to manage Jade Risk, did so in such a negligent and slipshod manner that Jade Risk failed to meet the 2016 Revenue Target and may fail to meet the 2017 Revenue Target.

55. Jarvis has been damaged by Defendants' negligence.

**G.  Breach of Contract: Taylor Chandler**

56. All of the allegations made in the preceding paragraphs are incorporated by reference as if fully restated here.

57. Taylor Chandler, LLC is a party to the Employment Agreement with Jarvis.

58. The Employment Agreement includes a provision for severance pay in the event Jarvis is terminated without cause.

59. Taylor Chandler, LLC terminated Jarvis without cause. Taylor Chandler has refused to perform its contractual obligations with regard to severance pay.

60. Jarvis has been damaged by Defendants' conduct.

### H. Tortious Interference With Contract: Individual Defendants

61. All of the allegations made in the preceding paragraphs are incorporated by reference as if fully restated here.

62. The conduct of Taylor, Chandler, and Johnson constitutes tortious interference with the Employment Agreement between Jarvis and TaylorChandler, LLC.

63. The Employment Agreement between Jarvis and TaylorChandler, LLC is a protectable business relationship.

64. The Defendants had actual knowledge of the existence of the Employment Agreement.

65. The individual Defendants were not parties to the Employment Agreement and had no rights with respect to that agreement.

66. The Defendants intentionally interfered with Jarvis' ability to earn the compensation contemplated by the Employment Agreement. Defendants further interefered with the Employment Agreement by causing TaylorChandler, LLC to terminate Jarvis' employment shortly after Jarvis asked for financial information to support the artificially low revenue numbers reported by Jade Risk.

67. Jarvis has been damaged by this conduct.

### I. Tortious Interference with Business Relationships: All Defendants

68. All of the allegations made in the preceding paragraphs are incorporated by reference as if fully restated here.

69. The conduct of Taylor, Chandler, and Johnson and Taylor Chandler constitutes tortious interference with the business relationships of Jarvis and his life insurance clients who have attempted to purchase captive management services from Jade Risk under its new management.

70. Jarvis' management of life insurance policies and sale of new life insurance policies to his clients constitute protectable business relationships.

71. The Defendants had actual knowledge of the existence of Jarvis' business relationships with life insurance clients who are also captive insurance clients of Jade Risk.

72. The individual Defendants are not parties to any agreements or negotiations between Jarvis and his life insurance clients and have no rights with respect to any such agreements.

73. The Defendants intentionally interfered with Jarvis' client relationships by deliberately failing to close and manage captive insurance deals set up by Jarvis for mutual clients of Jade Risk and Jarvis.

74. Jarvis has been damaged by this conduct.

### J. Wantonness: All Defendants

75. All of the allegations made in the preceding paragraphs are incorporated by reference as if fully restated here.

76. All Defendants' behavior was carried out with a reckless or conscious disregard of Jarvis' rights and therefore constitutes wanton behavior.

77. As a result of all Defendants' wanton behavior, Jarvis has suffered damages.

### K. Civil Conspiracy: All Defendants

78. All of the allegations made in the preceding paragraphs are incorporated by reference as if fully restated here.

79. All Defendants conspired together to commit each of the wrongful acts identified above.

80. Jarvis was damaged by Defendants' conspiracy.

### L. Accounting: All Defendants

81. All of the allegations made in the preceding paragraphs are incorporated by reference as if fully restated here.

82. Jarvis' rights under the Membership Purchase Agreement and Promissory Note are dependent on the revenues reached by Jade Risk under Defendants' management in 2016 and 2017.

83. Defendants have not accurately accounted for the revenues earned in 2016 and 2017 to date.

84. No detailed, dated statement or account of Defendants' revenues and fees generated from captive insurance clients in 2016 has ever been made available to Plaintiff.

85. No detailed, dated statement or account of Defendants' revenues and fees generated from captive insurance clients in 2017 to date has ever been made available to Plaintiff.

86. The revenue attributable to Jade Risk in 2016 and 2017 can only be ascertained through a full and complete accounting.

87. Jarvis therefore requests an accounting of Jade Risk's revenues for 2016 and 2017.

## V.     CONCLUSION AND PRAYER

For the reasons stated above, Plaintiff respectfully requests compensatory and punitive damages, including the attorney's fees contemplated by the contract, costs of suit, prejudgment and postjudgment interest as provided by law, and all other relief to which Plaintiff may be entitled in law or equity.

Dated June 16, 2017

Respectfully submitted,

**RICHARDS WHITNEY, P.C.**
1320 Arrow Point Drive, Suite 501
Cedar Park, TX 78613
512-565-8528

By: */s/ Jamie Whitney*
Jamie Richards Whitney
State Bar No. 24056202
jwhitney@richardswhitneylaw.com
**ATTORNEY FOR PLAINTIFF,**
**CHRISTOPHER JARVIS**