**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER JARVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:17-CV-396 |
| | ) | |
| TAYLORCHANDLER, LLC, | ) | **DEFENDANTS DEMAND** |
| T. BRITT TAYLOR, | ) | **TRIAL BY JURY** |
| NORMAN CHANDLER, and | ) | |
| JAMES R. JOHNSON, | ) | |
| | ) | |
| Defendants. | ) | |

**ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

COME NOW Defendants, TaylorChandler, LLC, T. Britt Taylor, Norman Chandler, and James R. Johnson, by and through their attorneys, Gilpin Givhan, P.C., and hereby submit their answer to Plaintiff's First Amended Complaint, and state as follows:

**I.      PARTIES**

1.      Defendants are without sufficient information to either admit or deny Plaintiff's allegations in Paragraph 1, thereof they are denied.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Defendants admit that TaylorChandler, LLC is an Alabama limited liability company with its principal place of business in Alabama. Defendants lack sufficient information as to any search done by Plaintiff and can neither admit nor deny Plaintiff's allegations as to any search in Paragraph 5, therefore they are denied. Defendants admit that no member of TaylorChandler, LLC is a Texas resident.

## II.    <u>JURISDICTION AND VENUE</u>

6.    Defendants are without sufficient information to either admit or deny Plaintiff's allegations in Paragraph 6.

7.    Admitted.

## III.    <u>INTRODUCTION</u>

8.    Defendants deny they breached their obligations under the subject Agreements, which adversely affected Jarvis' contractual rights, undermined his existing and prospective business relationships, and caused Jarvis significant damages. To the extent there are other material allegations contained in Paragraph 8, they are denied. As to all attached documents, Defendants denies their authenticity as presented and demands proper evidentiary proof as to authenticity.

9.    As to all attached documents, Defendants deny their authenticity as presented and demand proper evidentiary proof as to authenticity. Defendants deny all other material allegations, to the extent there are any in this Paragraph.

10.    As to all attached documents, Defendants deny their authenticity as presented and demands proper evidentiary proof as to authenticity. Defendants deny all other material allegations, to the extent there are any in this Paragraph.

11.    Defendants deny all material allegations in Paragraph 11.

12.    As to all attached documents, Defendants deny their authenticity as presented and demands proper evidentiary proof as to authenticity. Defendants deny all other material allegations, to the extent there are any in this Paragraph.

13.    As to all attached documents, Defendants deny their authenticity as presented and demands proper evidentiary proof as to authenticity. Defendants deny all other material allegations, to the extent there are any in this Paragraph.

14.     As to all attached documents, Defendants deny their authenticity as presented and demands proper evidentiary proof as to authenticity. Defendants deny all other material allegations, to the extent there are any in this Paragraph.

15.     As to all attached documents, Defendants deny their authenticity as presented and demands proper evidentiary proof as to authenticity. Defendants deny all other material allegations, to the extent there are any in this Paragraph.

16.     As to all attached documents, Defendants deny their authenticity as presented and demands proper evidentiary proof as to authenticity. Defendants deny all other material allegations, to the extent there are any in this Paragraph.

17.     Denied.

18.     Denied. As to all attached documents, Defendants deny their authenticity as presented and demands proper evidentiary proof as to authenticity.

19.     Denied.

20.     Denied. As to all attached documents, Defendants deny their authenticity as presented and demands proper evidentiary proof as to authenticity.

21.     Denied. As to all attached documents, Defendants deny their authenticity as presented and demands proper evidentiary proof as to authenticity.

22.     Denied. As to all attached documents, Defendants deny their authenticity as presented and demands proper evidentiary proof as to authenticity.

## IV.    BACKGROUND FACTS

23.     Defendants deny they are playing a game.

24.     There are no material facts for Defendants to either admit or deny. To the extent there are, they are denied.

25.     There are no material facts for Defendants to either admit or deny. To the extent there are, they are denied.

26.     As to all attached documents, Defendants deny their authenticity as presented and demands proper evidentiary proof as to authenticity. Defendants deny all other material allegations, to the extent there are any in this Paragraph except that Defendants did negotiate with Jarvis.

27.     As to all attached documents, Defendants deny their authenticity as presented and demands proper evidentiary proof as to authenticity. As pled, Defendants can neither admit nor deny the material allegations in Paragraph 27.  Therefore, it is denied.

28.     This Paragraph does not contain any material allegations that Defendants need to admit or deny and this Paragraph is not germane to the pleadings and should be struck.

29.     This Paragraph does not contain any material allegations that Defendants need to admit or deny and this Paragraph is not germane to the pleadings and should be struck.

30.     This Paragraph does not contain any material allegations that Defendants need to admit or deny and this Paragraph is not germane to the pleadings and should be struck.

31.     As pled, Defendants can neither admit nor deny. Therefore, it is denied.

32.     As pled, Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

33.     As pled, Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

34.     As pled, Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

35.     Denied.

36.     Denied.

37.     Denied.

38.     As pled, Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

39.    As pled, Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

40.    Denied.

41.    Denied.

42.    As pled, Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

43.    As pled, Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

44.    Denied.

45.    Denied.

46.    Denied.

47.    As pled, Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

48.    Denied.

49.    Denied.

50.    Denied.

51.    Denied.

52.    Denied.

## COUNT I.    BREACH OF IMPLIED COVENANT OF GOOD FAITH: INDIVIDUAL DEFENDANTS

53.    Defendants adopt all answers to previous paragraphs as if fully set herein.

54.    Denied.

55.    As pled, Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

56.     As pled, Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

57.     Denied.

58.     Denied.

### COUNT II.   FRAUDULENT INDUCEMENT: ALL DEFENDANTS

59.     Defendants adopt all answers to previous paragraphs as if fully set herein.

60.     Denied.

61.     Denied.

62.     Defendants are without adequate information to either admit or deny any allegations in this Paragraph.  Therefore, it is denied.

63.     Denied.

### COUNT III.   NEGLIGENCE: INDIVIDUAL DEFENDANTS

64.     Defendants adopt all answers to previous paragraphs as if fully set herein.

65.     As pled, Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

66.     As pled, Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

67.     As pled, Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

68.     Denied.

69.     Denied.

### COUNT IV.   BREACH OF CONTRACT: TAYLORCHANDLER

70.     Defendants adopt all answers to previous paragraphs as if fully set herein.

71.     Admitted.

72.    As pled, Defendant TaylorChandler can neither admit nor deny any material allegations. Therefore, they are denied.

73.    As pled, Defendant TaylorChandler can neither admit nor deny any material allegations. Therefore, they are denied.

74.    Denied.

75.    Denied.

## COUNT V.    TORTIOUS INTERFERENCE WITH CONTRACT: INDIVIDUAL DEFENDANTS

76.    Defendants adopt all answers to previous paragraphs as if fully set herein.

77.    The subject Defendants deny all material allegations.

78.    As pled, the subject Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

79.    As pled, the subject Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

80.    As pled, the subject Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

81.    Denied.

82.    Denied.

## COUNT VI.   TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS: ALL DEFENDANTS

83.    Defendants adopt all answers to previous paragraphs as if fully set herein.

84.    The subject Defendants deny all material allegations.

85.    As pled, the subject Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

86.    As pled, the subject Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

87.     As pled, the subject Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

88.     Denied.

89.     Denied.

## COUNT VII. WANTONNESS: ALL DEFENDANTS

90.     Defendants adopt all answers to previous paragraphs as if fully set herein.

91.     Denied.

92.     Denied.

## COUNT VIII.   CIVIL CONSPIRACY: ALL DEFENDANTS

93.     Defendants adopt all answers to previous paragraphs as if fully set herein.

94.     Denied.

95.     Denied.

## COUNT IX.   ACCOUNTING: ALL DEFENDANTS

96.     Defendants adopt all answers to previous paragraphs as if fully set herein.

97.     There are no material allegations made in this Paragraph.  To the extent there are, they are denied.

98.     Denied.

99.     As pled, the subject Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

100.    As pled, the subject Defendants can neither admit nor deny any material allegations. Therefore, they are denied.

101.    Denied.

102.    Denied.

All other material allegations and claims for damages not specifically numbered are specifically denied.

## AFFIRMATIVE AND ELECTIVE DEFENSES

1.      Plaintiff's Complaint fails to state a claim upon which relief may be granted.

2.      Defendants plead the general issue.

3.      Defendants plead assumption of the risk.

4.      Defendants deny proximate cause.

5.      Defendants plead estoppel, waiver, laches and statue of frauds.

6.      Defendants deny any causal relationship between its actions or non-actions and the alleged damages of Plaintiff.

7.      Defendants aver Plaintiff failed to mitigate his damages, if any.

8.      Defendants plead the affirmative defense of spoliation of the evidence, and as such, the Plaintiffs' right to recovery is barred.

9.      Defendants plead the right of set-off and/or credit for any monies paid by any other party.

10.      Some or all of the damages of which Plaintiff complains are the result of other alterations undertaken by Plaintiffs, and for which the Defendant is not liable.

11.      Plaintiff's damages, if any, are the result of a superseding, independent intervening causes.

12.      Defendants plead all other affirmative defenses in bar or abatement of the claims asserted against them in the Complaint.

13.      Defendants claim Plaintiff comes to this Court with unclean hands.

14.      To the extent that Plaintiff seeks recovery of, or indemnity for, any punitive or exemplary damages, the award of such damages violates Article I, Section 10[1] and/or the Fourth, Fifth, Sixth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States and

Article I, Section 6, and other provisions of the Constitution of Alabama on the following separate and several grounds:

(a) That civil procedures pursuant to which punitive damages are awarded may result wrongfully in a punishment by a punitive damages award after the fact.

(b) That civil procedures pursuant to which punitive damages are awarded may result in the award of joint and several judgments against multiple defendants for different alleged acts of wrongdoing.

(c) That civil procedures pursuant to which punitive damages are awarded fail to provide means for awarding separate judgments against alleged joint tortfeasors.

(d) That civil procedures pursuant to which punitive damages are awarded fail to provide a limit on the amount of the award against the defendant.

(e) That civil procedures pursuant to which punitive damages are awarded fail to provide specific standards for the amount of the award of punitive damages.

(f) That civil procedures pursuant to which punitive damages are awarded fail to provide specific standards for the award of punitive damages.

(g) That civil procedures pursuant to which punitive damages are awarded permit the award of punitive damages upon satisfaction of the standard of proof less than that applicable to the imposition of criminal sanctions.

(h) That civil procedures pursuant to which punitive damages are awarded permit multiple awards of punitive damages for the same alleged act.

(i) That civil procedures pursuant to which punitive damages are awarded fail to provide a clear consistent appellate standard of review of an award of punitive damages.

(j) That civil procedures pursuant to which punitive damages are awarded permit the admission of evidence relative to the punitive damages in the same proceeding during which liability and compensatory damages are determined.

(k) That standards of conduct upon which punitive damages are awarded are vague.

(l) That civil procedures pursuant to which punitive damages are awarded would permit the imposition of excessive fines.

(m) That civil procedures pursuant to which punitive damages are awarded permit the award of punitive damages upon satisfaction of a standard of proof which is not heightened in relation to the standard of proof for ordinary civil cases.

(n) That civil procedures pursuant to which punitive damages are awarded permit the imposition of arbitrary, capricious or oppressive penalties.

    (o)    That civil procedures pursuant to which punitive damages are awarded fail to limit the discretion of the jury and the award of punitive damages.

15.    Defendants aver that any demand for punitive damages in the instant case is subject to those limitations established by the Alabama legislature and set forth at Alabama Code § 6-11-21 (Repl. Vol. 1993).

16.    The Alabama Supreme Court's action in abolishing the legislatively-created cap on punitive damages was unconstitutional and without effect.

17.    Under the constitutions of the United States and the state of Alabama, the Alabama Supreme Court cannot abolish the cap created by the legislature on punitive damages through judicial decision. See *Honda Motor Company, Ltd. v. Oberg*, 114 S.Ct. 2331 (1994).

18.    To the extent that Plaintiff's demand for punitive damages may result in multiple damage awards to be assessed for the same act or omission against the Defendants, this award contravenes the Defendants' right to Due Process under the Fourteenth Amendment of the United States Constitution and the Due Process Clause of Article I, Section 13 of the Alabama Constitution. In addition, such an award would infringe upon the Defendants' right against double jeopardy insured by the Fifth Amendment of the United States Constitution and/or Article I, Section 9 of the Alabama Constitution.

19.    With respect to the any demand for punitive damages or indemnity therefor, the Defendants specifically incorporate by reference any and all standards or limitations regarding the determination and/or enforce ability of punitive damage awards that may be articulated in the decision of *BMW North American, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

20.    This Defendants contend that Plaintiff is not entitled to an award of, or indemnity for, punitive damages, and that an award of punitive damages against the Defendants, on the facts of this case, would be contrary to the Constitution of the State of Alabama and the Constitution of the United States. Further, any award of punitive damages to the Plaintiff is limited to the standards

set out in *BMW North American, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

21.    The Alabama system and structure for punitive damage awards, together with the claims for punitive damages sought by Plaintiff or indemnity sought by Third Party Plaintiff in this lawsuit, constitute a violation of the Due Process Clause of the Constitution of the United States, under authority of BMW North American, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

22.    Plaintiff's claims for punitive damages generally, and under the Alabama system specifically, constitute inadequate notice to defendant as to deprive defendants of due process of law.

23.    Defendants aver that any award of punitive damages in this case would violate the Due Process Clause, equal protection clause, and other provisions of the United State Constitution including, but not limited to, as follows:

   a.    Due Process Clause - Fourteenth Amendment to the Constitution of the United States: Punitive damages are vague and not rationally related to legitimate governmental interests.

   b.    Sixth Amendment to the Constitution of the United States: Punitive damages are penal in nature and, consequently, the defendant is entitled to the same procedural safeguards accorded to criminal defendants.

   c.    Self-incrimination Clause - Fifth Amendment to the Constitution of the United States: It violates the right against self-incrimination to impose punitive damages against the defendant that are penal in nature, yet compel the defendant to disclose potentially incriminating documents and evidence.

   d.    Excessive Fines Clause - Eighth Amendment to the Constitution of the United States: In the event that any portion of a punitive damages award against the defendant were to inure to the benefit of any state or governmental or private entity other than the Plaintiff, such an award would violate the excessive fines clause of the Eighth Amendment to the Constitution.

24.    Plaintiff's Complaint seeks to make these Defendants liable for punitive damages. The United States Supreme Court has reversed the Alabama Supreme Court in the case styled

*BMW of North America, Inc. v. Go*re, 116 S.Ct. 1589 (1996) on the issues of punitive damages. Defendants adopt by reference whatever defenses, criteria, limitations and standards as mandated by the United States Supreme Court decision in that case.

25.     Defendants affirmatively plead that any punitive damages that Plaintiff may recover in this case should be capped in keeping with *Ala. Code* § 6-11-21 and in the spirit of the Alabama Supreme Court's decision in *Oliver v. Towns*, 738 So.2d 798 (Ala. 1999).  Any demand for punitive damages is due to be struck because, on May 14, 2001, the United States Supreme Court released its decision in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001), holding that the amount of punitive damages, is not really a fact tried by the jury, and the right to jury trial is therefore not implicated. The court pointed to a fundamental difference between compensatory and punitive damages. Whereas compensatory damages are essentially a factual determination, punitive damages are an expression of more condemnation that essentially constitutes a conclusion of law. The court cited the Eight Amendment in explaining that constitutional excessiveness protections apply to both criminal and civil punishments. Such punishments should be determined by courts as a matter of law, rather than by a jury as a matter of fact.

## DEFENDANTS' COUNTER-CLAIM

COME NOW, Counter-Claim Plaintiffs/Defendants TaylorChandler, LLC, T. Britt Taylor, Norman Chandler, and James R. Johnson and for their Counter-Claim against Counter-Claim Defendant/Plaintiff Christopher Jarvis, and state as follows:

### PARTIES

1.      On information and belief, Counter-Claim Defendant/Plaintiff Christopher Jarvis ("Jarvis") is a resident citizen of the State of Texas.

2.      Defendant T. Britt Taylor ("Taylor") is a resident citizen of the State of Alabama.

3.      Defendant Norman Chandler ("Chandler") is a resident citizen of the State of Alabama.

4.      Defendant James R. Johnson ("Johnson") is a resident citizen of the State of Alabama.

5.      Defendant TaylorChandler, LLC ("TaylorChandler, LLC") is an Alabama limited liability company with its principal place of business in Alabama.

6.      Jade Risk, LLC ("Jade Risk"), a related entity, is a Texas limited liability company with its principal place of business in Texas.

### JURISDICTION

7.      This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds the sum or value of $75,000 (seventy-five thousand dollars), exclusive of interest and costs, and there is complete diversity of citizenship between the Plaintiffs and the Defendants.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the Individual Defendants reside here and TaylorChandler does business in the District.

## **FACTS**

9.      On July 1, 2016, Counter-Claim Plaintiffs/Defendants Chandler, Taylor, and Johnson purchased Jade Risk, LLC, from Lawrence L. Anderson and Jarvis pursuant to the terms of a Membership Interest Purchase Agreement (the "Purchase Agreement") that is governed by Alabama law.

10.     Jarvis was a life insurance broker who owned Jade Risk along with Lawrence Anderson.  Anderson was a passive owner in Jade Risk.

11.     Counter-Claim Plaintiffs/Defendants Chandler and Taylor are the owners of Counter-Claim Plaintiff/Defendant TaylorChandler, LLC.

12.      Counter-Claim Plaintiffs/Defendants Chandler, Taylor and Johnson were purchasers of Jade Risk.

13.     Counter-Claim Plaintiffs/Defendants Chandler, Taylor, and Johnson similarly own Arsenal Insurance Management, LLC, an Alabama insurance management firm that manages captive insurance companies ("Arsenal").

14.     Jade Risk was similar to Arsenal in that it managed numerous captives, some based in Oklahoma, some overseas.

15.     Counter-Claim Plaintiff/Defendant TaylorChandler, LLC hired Jarvis as an employee simultaneous with the aforementioned sale.

16.     As part of negotiations over purchase price in the Purchase Agreement, Jarvis provided Counter-Claim Plaintiffs/Defendants with a spreadsheet for a 2016 forecast of Jade Risk clients that included 58 clients and prospects with projected fees of $2,267,000.

17.     Of those 58 clients, 19 were entirely fabricated by Jarvis.

18.     Moreover, Jarvis planned on shutting down 24 of the other captives by the end of 2016.

19.     Jarvis suppressed this information from the Counter-Claim Plaintiffs/Defendants.

20.     For the entire year of 2016, Jade Risk received revenue from 38 captives.

21.     As of June 2017, 22 had been shut down or were planning to shut down by end of 2017.

22.     Of these 22, 10 were reformed in Alabama, but 12 were being permanently shut down.

23.     Under the Purchase Agreement, Counter-Claim Plaintiffs/Defendants paid Jarvis and Anderson $2,250,000 for the membership interests.

24.     A promissory note was also issued to Jarvis for $750,000 that was payable only upon Jade Risk hitting certain benchmarks.

25.     The first benchmark was revenue generated by Jade Risk between July 1, 2016 and December 31, 2016 must equal or exceed $1,010,000.

26.     If not, then there would be a "2016 Revenue Shortfall."

27.     The second benchmark was revenue generated by Jade Risk between July 1, 2016 and December 31, 2017, plus receivables as of December 31, 2017 must equal or exceed $3,260,000.

28.     If not, then there would be a "2017 Revenue Shortfall."

29.     If there were both a 2016 Revenue Shortfall and 2017 Revenue Shortfall, then the promissory note would be offset dollar-for-dollar by the lesser of the 2016 Revenue Shortfall and the 2017 Revenue Shortfall.

30.     The revenues for 2016 were $759,786; however, $230,000 of these revenues were prepayments for 4 captives for 2017, and thus not earned revenues in 2016.

31.     As a result, the actual 2016 revenue number was $549,786.

32.     As part of the closing, Jarvis also executed a Membership Interest Purchase Agreement (the "Purchase Agreement"), an employee agreement (the "Employee Agreement"), and a restrictive covenants agreement (the "Restrictive Covenants Agreement").

33.     Under Section 4.1 of the Purchase Agreement, Jarvis agreed to recommend and encourage all past and current clients of Jade Risk to maintain their business with the company.

34.     Section 2 of the Employment Agreement sets forth the duties of Jarvis as it relates to the Company (TaylorChandler, LLC) and Affiliates (Jade Risk and Arsenal).

35.     Section 2.1 provides that:

During the term of employment, Employee will:

(a)  Promote the interests, within the scope of his duties, of the Company and its Affiliates and to the Insurance Business and affairs;

(b)  …

(c)  Perform the duties and services consistent with the title and function of such office, including, but not limited to:

    i.   Establish and build new relationships with existing and potential clients, and referral sources for clients of the Insurance Business;

    ii.  …

    v.   Coordinate organizational resources to drive engagement of new and existing clients.

36.     Section 2.1 then provides that while Jarvis "is allowed to pursue other business activities and other forms of compensation," he must fulfill all obligations contained in the Employment Agreement and he cannot "violate the terms of the Restrictive Covenants Agreement entered by Employee incident to the Membership Interest Purchase Agreement." (Employment Agreement at p. 2).

37.     Specifically, Jarvis could not pursue activities competitive with "Business" as defined in the Restrictive Covenants Agreement.

38.      "Business," as defined in the Restrictive Covenants Agreement, is: "the Company's current business of providing captive management services. Captive management is the outsourced oversight of licensing, underwriting, claims, accounting and regulatory reporting

of a privately-held insurance company. This term specifically excludes deferred compensation strategies, and the sale of insurance to captive management and risk management companies."

39. Section 2.1 of the Employee Agreement clarifies that forbidden activities included, but was not limited to, selling life insurance products to captive insurance companies managed by the Company or Affiliates without the prior written consent of the Company.

40. Moreover, when clients who were obtained by the Company without the services of the Employee are introduced to Employee for insurance brokerage, a referral fee of 20% of the net commission received by the Employee shall be paid to the Company.

41. Under the Employment Agreement, for 2017 Jarvis was entitled to receive a monthly salary of $833.33 per captive he originated if Jade Risk was managing at least 36 captives when the salary was due.

42. Jarvis has not been entitled to receive any salary (although TC has paid Jarvis some salary in good faith anticipation that Jarvis would reach these targets).

43. The Employment Agreement allowed the Company to terminate Jarvis immediately for cause, which includes, among other things, material disloyalty or dishonesty with respect to the Company, intentional negligence in performing stated duties, and material breach of the Employment Agreement, Purchase Agreement, or Restrictive Covenants Agreement. (Employment Agreement § 5.2(b)).

44. Under the Restrictive Covenants Agreement, Jarvis is prohibited from soliciting current customers of Jade Risk, Arsenal, or TaylorChandler "with the intent of selling or attempting to sell any service or product similar to the Business provided by" those companies. (Restrictive Covenants Agreement at § 4).

45. Jarvis is also prohibited from competing with the companies, directly or indirectly, in the Restricted Area during the Restricted Period which runs until the latter of his date of

termination with TaylorChandler or two years from the date of the Restrictive Covenants Agreement.

46.     The restriction prohibits Jarvis from "on his own account, or as an employee, consultant, agent, partner, joint venturer, owner or officer of any other person, firm, partnership, corporation or other entity, or through his wife's ownership of entities or her activities, or in any other capacity:

(a)     act in a capacity, or provide services, similar to those in which Jarvis acted or which Jarvis provided for the Company, for any entity that engages in business that (i) is the same as, or substantially similar to, the Business, or (ii) directly or indirectly competes with the Business;

(b)     supervise, manage or oversee others engaging in any of the activities described above;

(c)     engage in the Business or otherwise engage in any business, venture or activity that is competitive with the Business; or

(d)     own any interest in, consult with, render services to or otherwise assist any person that does any of the foregoing.

(*Id*. at § 3).

47.     Jarvis represented that he entered into the Restrictive Covenant of his own free will and it shall be enforceable upon him.

48.     As a whole, these three documents, among other things, systematically laid out what business activities Jarvis could or could not take during the specified time periods.

49.     In March 2017, Jarvis provided Counter-Claim Plaintiffs/Defendants with a "2017 Marketing Roadmap."

50.     The Roadmap was provided to Counter-Claim Plaintiffs/Defendants on Arsenal letterhead.

51.     Part of the plan was "Brand-building" which included the preparation of a captive information packet.

52.    This packet should have contained Arsenal's brand and logo, but Jarvis branded it with "JarvisTower," which he used to promote his life insurance practice.

53.    On or around April 20, 2017, Jarvis held a webinar on captives, titled "Introduction to Captive Insurance Companies – A webinar – Revised message?"

54.    This webinar contained confidential and proprietary information of Jade Risk. Jarvis did not receive prior and needed consent from Counter-Claim Plaintiffs/Defendants to use this information.

55.    In addition, Arsenal was not promoted during this webinar and it was completely branded as Jarvis Tower.

56.    When confronted with this, Jarvis responded that it was presented from the "position [of] JarvisTower as a consulting and educational firm and [Jarvis] as a captive expert with 20+ years experience."

57.    These activities violated the aforementioned provisions of the Purchase Agreement, the Employment Agreement, and the Restrictive Covenants Agreement.

58.    Jarvis then unilaterally re-routed phone service from the Company to the new Jarvis Tower offices, while allowing the Company to pay for the phone services.

59.    Mr. Jarvis also setup LLCs for clients for his own benefit at the expense of the Company and the Counter-Claim Plaintiffs.

60.    Despite Counter-Claim Plaintiffs' concerns, Jarvis continued to operate Jarvis Towers in violation of the aforementioned agreements.

61.    Jarvis was also steering current and former clients away from the Company and instructing them to not pay owed fees.

62.    Jarvis was also diverting commissions from former Jade Risk clients for his own benefit to the exclusion of the Company. Specifically, Jarvis requested one of his life insurance

carriers to cancel any uncashed checks in the name of Jade Risk and have them reissued to a new bank account in his name.

63.     On information and belief, Jarvis evaded the prohibition on selling life insurance to captives by advising the captive owners to shut the captives down so that he could sell the life insurance directly to the owners.

64.     Counter-Claim Plaintiffs/Defendants ultimately terminated Jarvis for cause.

65.     The cause as outlined in the Employment Agreement was:

> a.    Failure to promote the interests of TaylorChandler, Arsenal and Jade Risk (collectively the "Companies"), establish and build new relationships with existing and potential clients, and maintain existing relationships and preserving existing clients.
>
> b.    Rather than promoting the Companies, Jarvis used company resources to promote himself and JarvisTower.
>
> c.    Rather than preserving existing relationships, Jarvis encouraged clients to shut down their captives.

66.     Jarvis also breached the Purchase Agreement

67.     In Section 2.3, Jarvis represented that the financial information he provided fairly presented the operations of Jade Risk.  This was false because (1) it included prospective clients that never existed and (2) he intended to shut down several of the captives which were generating revenue.

68.     In Section 2.5, Jarvis represented that since the date of the latest financials, no material adverse change in the operations of Jade Risk had occurred.  This was false because he had already spoken with an employee about shutting down 24 captives.

69.     In Section 2.11, Jarvis represented that nothing he provided to the Companies' clients contained an untrue statement of material fact.  Jarvis provided fraudulent financial information that included captives that never existed.

70.     In Section 4.1, Jarvis agreed to cooperate with clients to encourage Jade Risk clients to do their business.  Jarvis breached this by encouraging clients to shut down.  His potential motive

was to shut down the captives so he could sell life insurance policies, which enriched Jarvis to the detriment of Counter-Claim Plaintiffs'/Defendants' clients.

71.    Jarvis breached sections 2, 3 and 4 of the Restrictive Covenant Agreement by enriching himself to the detriment of the Companies' clients through (1) encouraging clients to shut down their captives and (2) using confidential information to promote JarvisTower.

72.    Jarvis has also retained property of TaylorChandler despite repeated demands for its return. These items include, but are not limited to, a laptop, 2 chairs, a printer, a scanner, and other office equipment.

## COUNT ONE: BREACH OF CONTRACT
### (EMPLOYMENT AGREEMENT)

73.    Counter-Claim Plaintiffs/Defendants adopt all proceeding allegations as if incorporated fully herein.

74.    Jarvis and the Company (Counter-Claim Plaintiff TaylorChandler, LLC) were parties to the Employment Agreement.

75.    The Employment Agreement was in effect during the period at question.

76.    Jarvis breached the Employment Agreement, among other reasons, by failing to promote the interests of the Company and preserve existing clients by encouraging captive clients to dissolve and form new limited liabilities companies that could purchase life insurance policies from Jarvis or his related entities including Jarvis Tower.

77.    The Company was not consulted on these projects, did not receive any revenue related thereto, nor did Jarvis obtain consent prior to advising clients to act.

78.    These actions lost clients for the Company and enriched Jarvis to the detriment of the Company.

79.     These breaches were material and damaged TaylorChandler, LLC.

## COUNT TWO: BREACH OF CONTRACT
### (RESTRICTIVE COVENANTS AGREEMENT)

80.     Counter-Claim Plaintiffs/Defendants adopt all proceeding allegations as if incorporated fully herein.

81.     Jarvis and the Company (Counter-Claim Plaintiff TaylorChandler, LLC) were parties to the Restrictive Covenants Agreement.

82.     The Restrictive Covenants Agreement was in effect during the period at question.

83.     Jarvis used Confidential Information about the captive clients of Jade to promote Jarvis Tower to persuade them to shut down so that he could establish LLCs that would purchase life insurance products from Jarvis to the detriment of the Companies in violation of Section 2 of the Restrictive Covenants Agreement.

84.     Jarvis' creation of JarvisTower and its promotions were in direct competition with the Companies and in violation of Section 3 of the Restrictive Covenants Agreement.

85.     Jarvis also used Confidential Information through the use of case studies and Jade seminar materials in conducting certain webinars in violation of Section of the Restrictive Covenants Agreement.

86.     These breaches caused significant injury to Counter-Claim Plaintiffs

## COUNT THREE: BREACH OF CONTRACT
### (PURCHASE AGREEMENT)

87.     Counter-Claim Plaintiffs/Defendants adopt all proceeding allegations as if incorporated fully herein.

88.     Jarvis and the Company (Counter-Claim Plaintiff TaylorChandler) were parties to the Purchase Agreement.

89.     The Purchase Agreement was in effect during the period at question.

90.     Jarvis materially breached the Purchase Agreement and caused significant injury to Counter-Claim Plaintiff TaylorChandler.

## COUNT FOUR: BREACH OF FIDUCIARY DUTY

91.     Counter-Claim Plaintiffs/Defendants adopt all proceeding allegations as if incorporated fully herein.

92.     Jarvis owed fiduciary duties of care, loyalty and good faith to the Company, its officers, and stockholders, including Counter-Claim Plaintiffs/Defendants.

93.     Jarvis's fiduciary duties include obligations to exercise good business judgment, to act prudently in the operation of the Company's business, to discharge his actions in good faith, to act in the best interests of the Company and its stockholders, and to put the interest of the Company before his own.

94.     Plaintiff breached his fiduciary duty of care by the actions previously pled.

95.     Counter-Claim Plaintiffs/Defendants have been damaged by the Plaintiff's breach of his fiduciary duties.

## COUNT FIVE: NEGLIGENCE

96.     Counter-Claim Plaintiffs/Defendants adopt all proceeding allegations as if incorporated fully herein.

97.     Jarvis owed a duty to Counter-Claim Plaintiffs/Defendants.

98.     Jarvis's actions, as previously pled, breached this duty.

99.     Jarvis's breach was the proximate cause of the injury to Counter-Claim Plaintiffs/Defendants.

100.    Counter-Claim Plaintiffs/Defendants were injured by Jarvis' negligent actions.

## COUNT SIX: BREACH OF LOYALTY

101.    Counter-Claim Plaintiffs/Defendants adopt all proceeding allegations as if incorporated fully herein.

102.    As an employee and agent of the Company, Jarvis owed a duty to the Company and the other Counter-Claim Plaintiffs.

103.    This duty required Jarvis to act honestly for the corporation's best interest and to avoid acts of self-dealing.

104.    Jarvis' acts of self-dealing violate this duty of loyalty.

105.    Jarvis' actions injured Counter-Claim Plaintiffs.

## COUNT SEVEN: FRAUD

106.    Counter-Claim Plaintiffs/Defendants adopt all proceeding allegations as if incorporated fully herein.

107.    Jarvis represented in negotiations over the purchase of Jade Risk and in a spreadsheet provided to the Company that there were over 58 captives either currently managed by Jade Risk, engaged for 2016, or committed for 2016.

108.    Of the 8 captives identified as "Engaged for 2016," none existed.

109.    Of the 11 captives identified as "Committed for 2016," none existed.

110.    These 19 captives were clearly created by Jarvis to increase the purchase price of Jade Risk.

111.    Of the 38 captives that generated revenue for Jade Risk over the entire year of 2016, 22 have been shut down or are planning to shut down. Of those 22, 10 have been reformed in Alabama. The remaining 12 have been shut down (9) or will be shut down (3) without any reason provided to the owners of Jade Risk. As of the beginning of June, 2017, there are 24 total Jarvis originated captives that have generated revenue in 2017.

112.    In fact, Jarvis knew prior to the closing that he intended to close several of the captives.

113.    Jarvis also communicated with clients and owners of captives and advised them to shut down whereby they formed limited liability companies who Jarvis proposed to sell life insurance or coordinated with another advisor to sell the life insurance.

114.    Jarvis knew the statements were false when circulated and published them.

115.    This information was material to Counter-Claim Plaintiffs/Defendants in deciding to purchase Jade Risk and the amount paid.

116.    Counter-Claim Plaintiffs/Defendants reasonably relied on these representations.

117.    Counter-Claim Plaintiffs/Defendants were injured by Jarvis' fraudulent statements.

## COUNT EIGHT: SUPPRESSION

118.    Counter-Claim Plaintiffs/Defendants adopt all proceeding allegations as if incorporated fully herein.

119.    Jarvis suppressed information that numerous captives did not exist and that he was planning on shutting numerous captives down.

120.    Jarvis had a duty to reveal this information in light of his other disclosures.

121.    The suppressed facts were material to the transaction and Counter-Claim Plaintiffs/Defendants decision to enter into the Purchase Agreement.

122.    This induced Counter-Claim Plaintiffs/Defendants to act.

123.    Counter-Claim Plaintiffs/Defendants was injured as a result.

**WHEREFORE PREMISES CONSIDERED**, Counter-Claim Plaintiffs/Defendants prays:

(1) That the Court enters judgment for Counter-Claim Plaintiffs/Defendants on all claims for relief asserted in the Complaint in an amount to be proven at trial, including punitive damages;

(2) That the Court enters judgment in favor of Counter-Claim Plaintiffs/Defendants for pre-judgment and post-judgment interest at the legal rate;

(3) That the Court awards Counter-Claim Plaintiffs/Defendants reasonable attorneys' fees and expenses of litigation;

(4) That all costs be assessed against Counter-Claim Defendant/Plaintiff; and

(5) That the Court awards such other relief as shall appear proper and just.

This the **11th** of **August, 2017**.

Respectfully Submitted,


*/s/ Royal C. Dumas*
Royal C. Dumas (ASB: 1404-R60D)
Leslie H. Pitman (ASB: 4391-E55H)
**Attorneys for TaylorChandler, LLC,**
**T. Britt Taylor, Norman Chandler, and**
**James R. Johnson**


**OF COUNSEL:**
GILPIN GIVHAN, P.C.
2660 EastChase Lane
Suite 300
Montgomery, Alabama  36117
(334) 244-1111
(334) 244-1969 (fax)
E-mail:rdumas@gilpingivhan.com
        lpitman@gilpingivhan.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this **<u>11th</u>** day of **<u>August, 2017</u>**, I electronically filed the above and foregoing document via Alafile system which will send notification of such filing to the following electronically:

Jamie Richards Whitney, Esq.
Richards Whitney, P.C.
1320 Arrow Point Drive, Suite 501
Cedar Park, Texas 78613
**Attorney for Plaintiff**

*/s/Royal C. Dumas*
OF COUNSEL