IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER JARVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TAYLORCHANDLER, LLC, T. | ) | |
| BRITT TAYLOR, NORMAN | ) | |
| CHANDLER, and JAMES R. | ) | Case No. 2:17-cv-396-ALB |
| JOHNSON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This case is a contract dispute between sophisticated businessmen. It has IRS bulletins, complicated life insurance plans, and more accountants than a golf course on April 16th. The Court held a multi-day bench trial at which the key players and various experts testified. This opinion resolves the parties' claims.

The parties were in the "captive insurance business." A captive insurance company is a subsidiary set up by a corporation to insure its risk. It is "captive" in the sense that it serves as the insurer for only one insured—its parent. Section 831(b) of the tax code allows individuals to do the same through privately held corporations and LLCs. The upshot is that wealthy individuals can assuredly pay themselves to insure themselves, thereby ensuring that a portion of their income and investment

gains are subject to lower taxes. Until recently, the mechanism could also be used to avoid the estate tax by moving money between insurance companies owned by a grandparent and grandchild.

Because creating and managing an insurance company is hard work with regulatory, accounting, and other complications, there are "captive insurance management" companies that form and manage these insurance companies for initial and quarterly fees. In this case, both Defendants and Plaintiff owned firms that formed and managed captives. But that is where their similarities ended. Plaintiff Christopher Jarvis saw captive insurance as merely one way to solve a client's immediate tax avoidance, estate planning, and cash-flow needs. Defendants Britt Taylor, Norman Chandler, and Johnny Johnson saw a captive insurance company as a stable, tax-advantaged way to help clients fulfill their small business's insurance needs over decades. Jarvis is a risk-taker; Defendants are conservative. Jarvis self-publishes books on financial planning and pitches doctors at medical conferences; Defendants run an accounting firm.

When Defendants agreed to buy Plaintiff's business and hire him as an employee, the resulting deal was doomed before the ink was dry. It fell apart less than a year after closing. Plaintiff filed this lawsuit alleging breach of contract, and Defendants responded by filing a counter-claim alleging a wide array of business-related misconduct.

## PROCEDURAL HISTORY

This action was originally filed by Plaintiff on June 19, 2017.  After two years, four Judges, and scores of filings, the case was reassigned to the undersigned on May 14, 2019.  A second amended complaint was filed on July 15 and a second amended counterclaim on July 31.

On November 12, 2019, Plaintiff filed a motion for summary judgment, *see* Doc. 147, and Defendants filed a motion for partial summary judgment, *see* Doc. 141.  Plaintiff's summary judgment motion was denied, and Defendants' motion was mooted by Plaintiff's voluntarily dismissal of certain claims. *See* Doc. 182.

The case went to trial between February 18 and February 21, 2020, concluding, after a brief hiatus caused by witness unavailability, on February 26. Plaintiff Christopher Jarvis and Defendants Britt Taylor, Norman Chandler, and Johnny Johnson all testified at trial.  The Court also received live testimony from expert witnesses Richard Avery, John Mastin, and Gary Bowers.  The Court received deposition excerpts from Ved Aggarwal, Paul Playfair, Nick Burkett, Jason Plummer, and Julia Stuart. Additional video deposition material of Julia Stuart was submitted to the Court on March 16.

## STANDARD

As this case involves no federal law, the relevant subject matter jurisdiction is diversity jurisdiction. Defendants are citizens of Alabama; Plaintiff is a citizen of

Texas. When sitting in diversity, the appropriate role for a federal court is to apply substantive state law. *See Bielski v. Alfred Saliba Corp.*, 984 F. Supp. 2d 1170, 1176 (M.D. Ala. 2013). The Supreme Court has held that the standard of proof is a substantive aspect of a claim. *See Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 192 (2014). Because Alabama law provides the substantive law that applies to the parties' dealings, Alabama law also provides the burden of persuasion. In a civil case in Alabama, the factfinder is "authorized to find that a controverted fact has been established if a preponderance of the evidence reasonably satisfies [him] of its truth." *Battles v. Tallman*, 406, 11 So. 247, 249 (Ala. 1892).

## GENERAL FINDINGS OF FACT

I.     **The parties and other important players.**

Plaintiff Christopher Jarvis is the proverbial man with the plan; the sort of financial fixer that one sees in movies and television shows. He has written multiple books about the concept of "success." He holds an MBA from UCLA. He founded Jade Risk with a partner to pitch wealthy small business owners on financial planning services, including captive insurance.

Defendants Chandler, Johnson, and Taylor are successful Alabama businessmen. Johnny Johnson spent twenty-five years with the Alabama Department of Insurance before retiring as Deputy Commissioner of the Property and Casualty

Division. Britt Taylor is the former vice president of Colonial Bank. Norman Chandler is a captive insurance prodigy who co-founded a captive management firm fresh out of school. These three co-own the Montgomery-based accounting firm TaylorChandler LLC. Defendants sought to merge Jarvis's Jade Risk with Arsenal Insurance, a wholly owned subsidiary of TaylorChandler.

Two administrative employees play a pronounced role in this litigation as well. Stephanie Matlock worked for Jarvis before becoming an employee of the Defendants after the acquisition. A military veteran, Matlock's strictly no-nonsense attitude led her to clash with Jarvis from time to time. Julia Stuart, a longtime administrator for various financial institutions, was hired by Jarvis after the acquisition and the two got along swimmingly to the end.

## II.   The Deal

Christopher Jarvis started Jade Risk, a captive insurance management business, in 2011. A captive insurance management business generally involves three tasks: (1) finding companies or high net worth individuals or families that could benefit by establishing a wholly-owned captive insurance company, (2) performing the accounting and regulatory tasks to create the captive insurance company, and (3) ensuring ongoing compliance with state insurance regulations and IRS tax regulations. Jarvis was talented at number 1, but he outsourced numbers 2 and 3 to outside lawyers and accountants. By 2015, Jade Risk was spending over

$800,000 annually on outside legal and accounting services for the captives it was managing.

Jarvis eventually decided to sell Jade Risk. He had grown tired of paying so much money to third parties, and a fellow investor in Jade Risk wanted out. Norman Chandler offered Jarvis a solution. Chandler's accounting firm had the manpower to perform regulatory and administrative tasks entirely in-house, and Chandler himself was a specialist in the tax and risk-pooling benefits of captive insurance companies. By selling Jade Risk and its book of business to Chandler's accounting firm, Jarvis could focus on the part of his job he enjoyed: interacting with people and solving their financial problems. By buying Jade Risk, Chandler's own captive management company, Arsenal, a subsidiary of TaylorChandler, would get a book of business with ongoing regulatory and accounting needs that it could add to its preexisting client base. It would also get Jarvis as an employee.

Thus began a lengthy negotiation process between Jarvis and the constituent partners of TaylorChandler. By the end of 2015, the parties had agreed to a purchase price of $3,000,000 for Jade Risk. They then sought to close the deal.

TaylorChandler applied to borrow money from Synovus Bank to complete the purchase. Part of the money for the loan came from the Small Business Administration and with it came an important limitation: if a loan from the SBA is used to buy a business, the seller may not remain employed with that business for

longer than a year after the purchase. In tension with this requirement was the desire of the bank (and Jarvis) that Jarvis stay on in some capacity. The parties developed a work around. Although Jarvis could not be an employee of Arsenal, as its imminent merger with Jade Risk would cause such an arrangement to violate the SBA regulation, he could become an employee of TaylorChandler itself to satisfy the bank.

Throughout 2016 Jarvis kept TaylorChandler apprised of changes to Jade Risk's book of business and conducted a new company valuation as late as July.  To assure TaylorChandler of Jade's financial health, Jarvis sent an email on July 10, 2016 detailing prospective clients that could not move forward until the merger went through. On August 9, Stephanie Matlock, Jarvis's assistant, sent another email to Chandler. This email represented that Jade Risk had 35 active captives and that at least six of those captive clients would imminently surrender or dissolve. Matlock emailed again on August 23 to detail the surrender or dissolution of a further six captives. This brought the list of stable captives managed by Jade Risk down to 23. The deal closed four weeks later without a change in terms or purchase price.

Jarvis made financial concessions to assuage TaylorChandler's concerns that surrendering captives and increased regulatory scrutiny would translate into a loss on the deal. Jarvis volunteered to defer $175,000 of his salary and $750,000 of the

purchase price and suggested that the agreement include performance benchmarks that could substantially reduce the deferred payments if he failed to meet them.

The deal closed in September with the signing of four documents, each with an effective date of July 1, 2016.

First, the parties signed a membership interest purchase agreement that transferred Jade Risk's ownership from Lawrence Anderson[1] and Christopher Jarvis to Britt Taylor, Norman Chandler, Johnny Johnson. It sets the purchase price as $3,000,000 with $2,250,000 in cash and $750,000 due under the terms of a promissory note.

Second, they signed a 60-month employment agreement between Jarvis and TaylorChandler. Section 2 of the employment agreement governs Jarvis's duties to TaylorChandler:

General Duties.  During the term of employment, Employee will:

(a) Promote the interests, within the scope of his duties, of [TaylorChandler and Arsenal];
(b) Serve as Director of Business Development of [TaylorChandler], reporting directly to the members of [TaylorChandler] and any chief officer appointed by such; and,
(c) Perform the duties and services consistent with the title and function of such office, including, but not limited to:
    a. Establish and build new relationships with existing and potential clients, and referral sources for clients of [Arsenal];
    b. Maintain existing relationships in order to preserve existing clients of the [Arsenal];

---

[1] Lawrence Anderson was a doctor and Christopher Jarvis' silent partner in Jade Risk.  Anderson transferred his shares into a trust for Jarvis so Jarvis could unilaterally negotiate the sale.

c.  Develop marketing strategies for increasing clients of [Arsenal];
d.  Introduce and leverage other [TaylorChandler] and Affiliate programs and services as appropriate; and
e.  Coordinate organizational resources to drive engagement of new and existing clients.

These specific provisions in the duty section are followed by a paragraph that specifies the things Jarvis may do independently while employed by TaylorChandler:

> Notwithstanding [his duties to TaylorChandler], [Jarvis] is allowed to pursue other business activities and other forms of compensation, and [he] shall retain all revenue and profits therefrom, so long as [he] fulfills his obligations herein and does not violate the terms of the Restrictive Covenants Agreement….For the avoidance of doubt, [Jarvis] is allowed to pursue other types of insurance, financial planning and other business that are not competitive with [TaylorChandler's outsourced oversight of licensing, underwriting, claims, accounting and regulatory reporting of a privately-held insurance company].[2]  Specifically, [Jarvis] is allowed to sell insurance to clients of [TaylorChandler]; provided, however, [he] may not sell any life insurance products to captive insurance companies managed by [TaylorChandler] or Affiliates without the prior written consent of [TaylorChandler].

Third, they signed a restrictive covenants agreement between Jarvis and Jade Risk, now owned by Chandler, Johnson, and Taylor.

Fourth, they signed a promissory note including details for the gradual payment of the remaining purchase price.

---

[2] The employment agreement provides that Jarvis may not compete with the "Business" described in the restrictive covenants agreement. "Business" is defined there as captive management services and captive management services in turn is defined this way.

In addition to the $2,250,000 in cash, these agreements grant Jarvis a variety of compensation sources, some of which are contingent upon the completion of certain benchmarks. First, the employment agreement provides that he is to receive $15,000 for each month from July-December 2016. Second, he is to receive $175,000 of deferred salary within ninety days after the end of 2016 or, depending on revenues, within ninety days after the end of 2017. Third, Jarvis is to receive a one-time payment of $20,000 per new captive that he originates for TaylorChandler. The bonus payments for captives originated in 2016 can be delayed in the same fashion as the deferred salary if revenue targets are not met. Fourth, in January of 2017, Jarvis's regular salary is replaced by an incentive system that provides a monthly salary equal to $833.33 per captive he has originated since July 1, 2016, provided that the Jade Risk book of business has at least thirty-six captives under management. Fifth, Jarvis is entitled to the deferred $750,000 portion of the original Jade Risk purchase price unless there is a revenue shortfall. The membership interest purchase agreement provides that if revenue derived from former Jade Risk captives and captives originated by Jarvis between July 1, 2016 and December 31, 2016 does not amount to $1,010,000 then the $750,000 will be reduced by the difference between that target and realized revenue.[3] Sixth, Section 5.4 of the employment

---

[3] This equation is known in the agreement as the "2016 Revenue Shortfall." There is another revenue shortfall equation for 2017. The agreement provides that the $750,000 is reduced by the smaller of the two. Because Jarvis was fired only five months into 2017, the Court, like the parties,

agreement provides that, if Jarvis is terminated without cause, TaylorChandler will owe him the "average monthly salary" he was receiving in 2017 until the end of the sixty-month term of the employment contract.

Most of the parties' dispute revolves around the interpretation and application of these provisions. One point of contention is how the parties ought to calculate revenue for the purposes of determining whether Jade Risk's revenue hit the $1,010,000 target. In one version of the employment agreement that was signed by Jarvis but not Defendants, Section 3.1(b)(vii) specifies that "revenues shall include only (A) cash in Jade's checking account on the Effective Date and (B) cash revenues actually received by Jade between the Effective Date and the last day of the Initial Term." This was referred to throughout the trial as the "cash-basis" method. The version of the employment agreement signed by both parties had Section 3.1(b)(vii) removed. The other contender is the "accrual" method, which conforms with Generally Accepted Accounting Principles and counts as revenue, not only cash received by the company by a set date, but also the cash owed for services performed by that date. Experts agree that there was a revenue shortfall under the cash basis method but not under the accrual method.

---

uses the 2016 revenue shortfall on the assumption that the 2017 shortfall would be significantly higher.

The revenue shortfall was not something that became seriously contentious until this litigation. Jarvis and Chandler had a series of informal communications about Jade Risk's revenue in 2016. At the end of 2016, Arsenal sent Jarvis a sales summary showing the revenue streams relevant to his compensation: $457,286.88 in Jade Risk revenue and $302,500.00 in Arsenal revenue attributable to captives that Jarvis had originated. Jarvis believed there were inaccuracies in the accounting data he received, but he was fired before he could pursue it meaningfully with the company. Although Jarvis believes TaylorChandler intentionally delayed or otherwise manipulated payments to reduce total revenue, there is no evidence of that. Instead, any delays or errors were due to difficulties in merging the two companies.

## III.   The Deal falls apart.

After the deal closed, the parties began to have difficulty merging Jade Risk into Arsenal and converting Jarvis from an owner into an employee. There were two reasons for these difficulties: adverse federal regulatory changes and fundamental differences in business philosophy.

### A. Federal regulatory challenges hurt the captive insurance industry.

The parties' deal occurred against a backdrop of adverse federal regulatory changes in the world of captive insurance.[4] In December of 2015, the PATH Act was

---

[4] Some of the information in this paragraph comes from Plaintiff's expert Bowers and from Plaintiff Jarvis, who both testified about regulatory issues in the captive insurance industry. Defendants objected to both kinds of testimony.

passed. This legislation increased disclosure requirements for captive owners and prevented estate tax avoidance by making all related captive owners the same person for attribution purposes. Then, in November of 2016, the IRS promulgated Notice 2016-66. Notice 2016-66 announced that transactions by small insurance companies would be viewed as "transactions of interest" and included an ex post facto requirement that all captives render a detailed account of their transactions over the last ten years. Chandler testified at trial that 2016-66 had a chilling effect on the captive industry.

After 2016-66 was promulgated, Jarvis spent a great deal of time taking calls from clients and trying to reassure them that maintaining a captive insurance company was worth the trouble. He was not always successful.

In December of 2016, Nick Burkett, an accountant who worked on captives with Jarvis, sent an email to Chandler with two surrendering captives not previously

---

Defendants moved to exclude Bowers's testimony as inadmissible legal conclusions. *See* Doc. 145.  That motion is denied. Bowers has a great deal of experience in the captive insurance industry and is more than qualified to opine on ordinary practices within the industry and about how it was affected by regulatory changes. That his opinions touch on legal and regulatory changes does not make them impermissible legal opinions, and they do not go to any ultimate legal issue in the case.

Defendants erroneously argue that Jarvis should not be allowed to testify as an expert because his witness disclosures were insufficient under Rule 26(a)(2)(C). *See* Doc. 145 at 3. The appropriate inquiry when determining whether an expert is required to provide a disclosure is whether he (1) had a connection to the specific events underlying the case, which qualifies for less disclosure, or (2) provides a technical evaluation of evidence learned in preparation for trial, which does not.  *See Prieto v. Malgor*, 361 F.3d 1313, 1319 (11th Cir. 2004).  Jarvis was not specially retained, and his opinions were formed in real time based on first-hand factual knowledge of the underlying dispute. Jarvis's disclosures were sufficient.

13

listed by Matlock, one of which was shutting down due to regulatory pressure. After these repeated surrenders, Jarvis texted Chandler in February and said "I would never try to screw you guys.  I hope you know that about me," to which Chandler responded, "I know."

Between the end of 2016 and the beginning of 2017, Jarvis had conversations with two doctors who owned captive insurance companies: Dr. Ved Aggarwal and Dr. Paul Playfair.  Aggarwal emailed Stephanie Matlock (now working for Arsenal) on January 4, 2017 to say that he "had a meeting with Mr. Jarvis and [was now] going to surrender" his captive. Defendants testified at trial that they deduced from this email that Jarvis had caused Aggarwal to surrender his captive. But Aggarwal explained in a signed declaration that Jarvis had never encouraged him to surrender his captive and had instead attempted to convince him to keep it. Based on his discussions with Aggarwal, Jarvis testified that he believes Aggarwal surrendered due to the reporting requirements of 2016-66. Dr. Paul Playfair indicated an intent to surrender in October of 2016. Playfair also confirmed in a deposition that Jarvis had not encouraged him to surrender his captive.  Jarvis testified that his discussions with Playfair led him to believe that Playfair had concluded that his practice was no longer large enough to justify a captive.

Jarvis continually texted Chandler throughout the end of December 2016 and early January 2017 to ask whether the numbers were looking good and whether

14

Taylor and Johnson were pleased with his production. The parties agree that, before the end of 2016, Jarvis originated at least 8 captives for Arsenal.

### B. Fundamental differences in philosophy strain the parties' relationship.

The parties also had difficulty merging their businesses because of fundamental differences in their business philosophies. Jarvis is a risk-taking entrepreneur who looks for creative (and potentially risky) ways to help clients save money. TaylorChandler is a conservative accounting firm. There were bound to be problems, and there were.

There were five main problems.

First, there were communication problems between Jarvis (in Texas) and TaylorChandler (in Alabama). By January of 2017, Jarvis was complaining to Chandler that he had significant concerns about the services Jade Risk clients were receiving from the new organization. Chandler responded that it was due to "poor organization and communication on [Chandler's] part." A month later, in February of 2017, Chandler learned that Jarvis had switched the Arsenal phone number so that it would be routed to Jarvis's office in Grapevine, Texas. After Chandler had the number switched back, the number was switched two more times. Eventually, Jarvis's Texas office was shut out of the account.

Second, the parties never assessed Jarvis's 2017 salary as provided under the employment agreement, and he was continuing to be paid at a flat rate of $15,000 a

month. An explicit condition of the continuing 2017 salary was that Jade Risk have at least 36 active captives under management per 3.1(c) of the employment agreement.  But the parties disagree over whether Jade Risk had that many. Although the emails sent by Matlock make clear that Jade Risk had only 23 captives when the deal was formally signed, Jarvis claims he originated sixteen captives in the remaining months of 2016. Six of those captives were reincarnations of captives that had surrendered, "the Buckley captives," and one of them was a captive owned by Jarvis himself, for which he paid around 25% of the usual fee.

Jarvis testified that any captive that still owed fees ought to be considered an active captive, even if it was in the process of surrendering. By that logic, Jarvis testified that Jade Risk had the following active captives under management at the end of 2016: ALS, Carodan, DK, K&L, KMJ, Monticello, Casualty Protection Group, Commercial Exchange, Cosmetic Surety, Fox Bay, Granite, East River, Global Indemnity, IDB Highlands, GTTX, Lakeside, Leadenhall, Loxford, Middlegate, Next Generation, NIW, Pain Management, Pocono, Potomac, Premium Capital, Tarpon Risk, Wellfleet, and Wimberly, ASC, Eastcliff 2, Clover Tool, Central Texas, Vikas, CT Risk, and SSI in addition to others he could not remember on the stand. Jarvis counted both the surrendered and reincarnated Buckley captives. Twenty-two of the captives Jarvis counted displayed no invoice until 2017 in Arsenal's financial records.

Third, the parties had different views about what Jarvis was expected to do as an employee. Defendants never provided Jarvis with a job description or a set of objectives. Because no job description was forthcoming, Jarvis began to define his own role within the new firm. He focused on developing his own brand to generate captive referrals for Arsenal. Jarvis created a separate company—JarvisTower—that he planned to use to sell life insurance, market books, and provide financial consulting. On January 30, 2017, Jarvis told Chandler that he could make TaylorChandler a lot of money if he set up an independent brokerage firm. He believed there would be a symbiotic relationship between the two firms with Jarvis as "the broker who looks for better solutions for clients and advisors (and [Arsenal] is one [solution])." Chandler responded that he "totally" agreed and believed that to be the direction in which their relationship should move.

In addition to his new brokerage firm, Jarvis partnered with IPS Advisors, a Texas firm that managed health insurance for publicly traded companies. Jarvis had two deals with IPS. First, he and IPS would use the products of Lion Street, an insurance wholesaler, and bonuses received from a sale by either Jarvis or IPS would be based on their combined production. Second, Jarvis paid an IPS agent named Dan Stanley $3,500 per month to do his underwriting for him. Jarvis also had an IPS email account.

Although Chandler acquiesced to Jarvis's plan by text message, his partners were concerned about it. On January 31, Jarvis sent an email to Chandler announcing that he had hired Jason Plummer and Julia Stuart to assist him with operations in Texas. Plummer and Stuart worked for JarvisTower, and Jarvis paid them from his own funds. Chandler emailed Jarvis on February 9 to set up a call with Taylor and Johnson: "[t]hey want to hear from you what all is going on with Jarvis Tower and the employees that you've hired.  It seemed to come out of nowhere. There is a potential conflict of interest and we need to ease their concerns."

After the call, Jarvis sent an email to follow up.  He says that JarvisTower is the centerpiece of his "captive linchpin" strategy.  Jarvis writes that "everything has been done to continue to build my marketing around the 'captive linchpin' strategy." Jarvis explains he created JarvisTower because he "needed an entity that [he] could use as a central point for consulting – which will lead to more captive and insurance business," writing that JarvisTower was "counting on future revenues from working together with Arsenal and TaylorChandler."

Although Jarvis's employment agreement states that he is the Director of Business Development for TaylorChandler, Jarvis reminded Defendants in the February 22 email that they had agreed he would instead hold himself out as a member of the Arsenal Board of Directors. At trial, Jarvis testified that this was to (1) appear to give Arsenal strategic vision, (2) make Arsenal seem forward-thinking

by having consultants on the board, and (3) allow him to get in the door without seeming like a salesman for an accounting firm. There is no reply in the record from Defendants to the February 22 email, and there is no dispute that Jarvis had business cards that listed him as a member of Arsenal's Board of Directors.

On February 27, Jarvis emailed a ten-step marketing plan for Arsenal to Taylor, Chandler, and Johnson. The plan was extensive and detailed. The first step, titled "Confirm Goals," sets out his vision for the relationship between Jarvis and Defendants. In Step I(b)(i), Jarvis sets the goal of maintaining 80% of the old Jade Risk captives. In Step I(b)(ii), Jarvis also discusses "[i]ntroduc[ing] Arsenal to 100 advisors and prospects via webinar, telephone, or conference." As part of efforts to build the brand in Step I(c)(vi), Jarvis commits to writing E-Newsletters, articles for mailed statements, books, and webinars. Jarvis also devotes substantial space in Step I(d) to strategies for increasing revenue through life insurance sales. Steps 2-4 discuss Jade Risk transition logistics. Steps 5-6 discuss the education of prospective clients through publication; Step 6 predominantly discusses Jarvis's personalization of his book "Wealth Secrets for Physicians" for the state of Alabama and disseminating a publication called "Wealth Secrets for Alabama Physicians." Step 7 is titled "National Branding of Jarvis." It includes book publishing, memberships in various financial organizations, and a budget for marketing Jarvis/JarvisTower, as well as for a separate client services director and executive assistant for JarvisTower.

The plan explains that these costs will be borne by JarvisTower.  Steps 8 and 9 are broad references to exposure driven by published materials and strategic partnerships, and Step 10 calls for regular review of the plan.

On March 24, Taylor, Chandler, and Johnson responded to Jarvis with an edited and approved version of the marketing plan.  Step 7 escaped comment.  The only comment that could be considered corrective was made on Step I(c)(iii) which is the "Work with Peralta to update CIC Packet" subsection.  Chandler commented that the packet needed to "cut a good bit of the tax and estate planning talk."  The Smith Paving Case Study, right above the CIC packet, also escaped comment.  One comment highlighted the material Jarvis was disseminating—books, newsletters, and webinars—and made clear that TaylorChandler wanted to review them "before publishing."

Fourth, there were disputes about Jarvis's marketing materials and strategies.  On April 21, Jarvis emailed Chandler a copy of a PowerPoint webinar that he had given the day before to CPAs. Jarvis's bio on the first page mentioned that he was on the board of directors of Arsenal, and that it was both rated a top captive manager by Captive Review Magazine and the largest manager in Oklahoma and Alabama.

The PowerPoint also mentioned Arsenal as the owner of the Smith Paving Case Study.  This was a hypothetical case study created by Jarvis before he sold Jade Risk to illustrate how a construction company could dramatically reduce its tax

liability by using a captive. Chandler testified at trial that, because it framed captives as a tax dodge and would draw the ire of the IRS, he had told Jarvis that he didn't want Arsenal's name on it. Jarvis denies being told this. Having observed the witnesses, the Court finds that Chandler never told Jarvis not to use the case study, although he clearly did not want Jarvis to use it.

Fifth, the apex of the parties' philosophical disagreement was Jarvis's model to use PLLCs to draw money out of a captive insurance company in an aggressively tax-advantaged way. Although the particulars of the plan are not clear on the record, the gist of it is as follows. Under Jarvis's plan, the captive would purchase preferred interests in a Preferred Limited Liability Corporation that have priority when distributions occur. But these distributions would not occur until years in the future, thus reducing the investment's valuation for tax purposes. Other investors would purchase common interests. The common interest-holders would make investments that could be used to pay the captive's claims. In return for their capital exposure, the common interest-holders get most of the PLLC's investment proceeds if the returns are better than expected. The PLLC then purchases a life insurance policy in the name of the captive's owner that has the effect of moving money from the PLLC to the owner in a tax advantaged way.

Jarvis discussed the PLLC structure with Defendants at a meeting in Dallas before the deal closed. Taylor testified at trial that he did not fully understand the

PLLC presentation and that he remembered Jarvis saying the structure could be used "way down the road when a captive is ready to shut down." Chandler testified that the PLLC structure was risky and likely to draw the unfavorable attention of the IRS: "So you're now sort of double dipping the tax benefits. So you put it in [the captive] with, you know, a tax—a big tax break, you pull it out with a very significant tax break, and you've paid very little tax on this whole transaction." The Court credits Defendants' testimony that they viewed the PLLC structure as risky from a regulatory and tax perspective. But the Court credits Jarvis's testimony that nothing about his proposed use of a PLLC to wind down a captive that had served its purposes was inconsistent with the formation and maintenance of another captive insurance company.

## IV.   Jarvis is terminated.

In early May 2017, Chandler flew to Dallas to meet with Jarvis. In this meeting he expressed that, going forward, Taylor and Johnson wanted to satisfy Jarvis's remaining remuneration on an incentive basis, ridding themselves of the deferred salary obligations owed to Jarvis at that point. Jarvis refused to change the deal. When Chandler called Jarvis in late May to tell him that he needed to either renegotiate his deal or face for-cause termination, Jarvis once again refused to budge. Jarvis was then sent a termination letter in the mail on May 25.

The letter stated that Jarvis "materially breached [his] duties contained in Section 2.2, in addition to violating [his] duty of loyalty to the companies" and "violated Sections 2, 3, and 5 of the Restrictive Covenants Agreement" to "enrich[] [him]self at the cost of the Companies." Jarvis had done this, according to the letter, by, among other things, "advising current captive insurance company clients to dissolve their captives so that [he] may sell them life insurance products; and using confidential information and products to promote [his] own venture, JarvisTower, including conducting a webinar without any references to services provided by the Companies and holding JarvisTower out as a direct competitor to the Companies." Jarvis was also accused of violating Sections 2.3, 2.5, and 2.11 of the membership interest purchase agreement "by including revenues of captives in financial information that had either not been formed or had to be shut down soon after closing (or were encouraged to be shut down by [Jarvis])…fraudulently represent[ing] the number of captives under management or committed to be formed in 2016, of which at least 11 were engagements that were fabricated and never existed; and…breach[ing] Section 4.1 by encouraging captive clients to dissolve instead of encouraging clients to maintain their business with the Companies." At trial, Defendants made clear that an additional reason, not listed in the letter, was insubordination.

## V.    Jarvis fails to preserve documents.

Jarvis was terminated by TaylorChandler on May 25. Julia Stuart testified that Jarvis did not tell her to preserve emails for his defense or wipe data from the desktop computer in the Grapevine office, but she did both of those things anyway.[5] In her initial deposition, Julia Stuart said she did not delete anything from the computer, but in a subsequent affidavit she said that she had deleted everything. Stuart also shredded all the hard documents that were on site.  At trial, Jarvis testified that he had no knowledge of the destruction of documents because he was overseas when it occurred. Prior to trial, Jarvis wrote in an affidavit that he authorized the shredding because he did not want the documents to be discovered by other office tenants. Whatever authorization took place, Julia Stuart began to solicit bids from third party shredding vendors and eventually purchased the services of Sierra Shred, who showed up on June 12, 2017 and shredded 15 boxes of documents in 20 minutes. The rationale offered by Stuart for her actions was that the Grapevine office was "open-concept" and anyone in the building could have gained access to the files. However, defense counsel paid a visit to the Grapevine office and took pictures showing that there was nothing "open-concept" about the office at all; it has hallways and doors that lock.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO SPOLIATION, DEFENDANTS' COUNTERCLAIMS, AND PLAINTIFF'S CLAIMS

There are three main issues for the Court to resolve. First, Defendants filed a substantial motion for spoliation sanctions. Second, the Court makes findings of fact and conclusions of law as to Defendants' counter-claims. Third, the Court makes findings of fact and conclusions of law as to Plaintiff's claims.

## I.      Spoliation sanctions are warranted.

Defendants move that Plaintiff be sanctioned for destroying documents and deleting electronic files. The test governing spoliation of physical documents is slightly different than the test governing spoliation of electronic documents. But the result is the same in this case.

### A. There was spoliation.

As an initial matter, the Court finds that there was spoliation. Defendants allege two acts of spoliation: the deletion of digital data from the Grapevine desktop and the shredding of paper documents stored in the Grapevine office.

To establish spoliation of physical documents, Defendants must prove that a destructive act occurred, that litigation was reasonably foreseeable at the time, and that the act was undertaken in bad faith. *See Morrison v. Veale*, 2017 WL 372980,

---

[5] Whether or not Jarvis asked her to save emails for his defense, Stuart did.  She emailed Jarvis a list of emails in chronological order that were relevant to his termination letter.

at *5 (M.D. Ala. Jan. 25, 2017); *see also Speaker v. U.S. Dep't of Health & Human Servs. Centers for Disease Control & Prevention*, 2012 WL 13071495, at *17 (N.D. Ga. Mar. 14, 2012). Bad faith may be established through direct evidence, by showing that the opposing party acted with "willful and premeditated" intent, *see Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 134 (S.D. Fla. 1987), or through circumstantial evidence, by showing that (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case, (2) the spoliating party engaged in an affirmative act causing the evidence to be lost, (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence, and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator. *See Calixto v. Watson Bowman Acme Corp.*, 2009 WL 3823390, at *16 (S.D. Fla. Nov. 16, 2009). *See Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 746 (N.D. Ala. 2017) (applying this test to request for sanctions under Rule 37); *Bell Aerospace Servs., Inc. v. U.S. Aero Servs., Inc.*, 2010 WL 11425322, at *2 (M.D. Ala. Feb. 18, 2010) (citing and approving the bad faith test from *Calixto*).

To establish spoliation of electronic documents, Rule 37 of the Federal Rules of Civil Procedure requires a party to establish that the evidence (1) should have been preserved in the anticipation or conduct of litigation, (2) is lost because a party

failed to take reasonable steps to preserve it, and (3) cannot be restored or replaced through additional discovery. Fed. R. Civ. P. 37(e). *See also Sosa v. Carnival Corp.*, 2018 WL 6335178, at 10 (S.D. Fla. Dec. 4, 2018); *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 2018 WL 4856767, at 2 (N.D. Fla. Oct. 5, 2018). *Butzer as Next of Friend C.W. v. Corecivic, Inc.*, 2018 WL 7144285, at *2 (M.D. Fla. Sept. 12, 2018).

The Court finds that evidence was destroyed that should have been preserved in anticipation of litigation. In the Eleventh Circuit, the duty to preserve is triggered when litigation becomes reasonably foreseeable. *See Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009). The day before Jarvis was terminated, he contemplated the involvement of lawyers during a phone call with Chandler. Just over three weeks later, on June 16, 2017, Jarvis filed this lawsuit. Jarvis explicitly requested that Stuart help him preserve documents by May 31, only seven days after his firing. TaylorChandler also contemplated litigation and warned Jarvis not to destroy documents.

The destroyed evidence was relevant to the anticipated litigation. Although there are no specific paper documents that Defendants point to as relevant, Matlock has attested that the shredded boxes contained Jade Risk client records, which are relevant to the subject of Jarvis's interactions with those clients. On the digital front, Defendants point to 154 files deleted by Stuart after Jarvis's May 24 termination. These files are mainly from Julia Stuart's deleted email account. Defendants'

forensic expert was able to recover fragments of emails and, judging from their titles and the relevance of other emails that were recovered, they are relevant.

There is no meaningful dispute that these documents cannot be recovered through additional discovery. Defendants hired a forensic expert who recovered fragments of emails, but not all the emails. Of the 9,162 files deleted from the Grapevine desktop computer in 2017, 154 files were deleted between May 24 and June 8, the period immediately following Jarvis's termination. Some of them referenced marketing and insurance proposals. These documents cannot be recovered.  Similarly, the shredded physical documents are irretrievably lost.

The Court also finds that this evidence was destroyed in bad faith. Although there is no direct evidence of a premeditated scheme, circumstantial evidence of bad faith abounds. First, because the boxes of Jade Risk client files in Grapevine could fairly be supposed to be connected to litigation that involved those clients, the Court finds as fact that material evidence was destroyed. This is also true of the electronic documents. Second, Stuart admitted that she engaged in acts that caused the evidence to be lost. Third, Jarvis should have known that he was under an obligation to preserve the information at the time Stuart, his agent, destroyed it; Defendants' counsel requested that all Jade Risk information be preserved on June 2 and Stuart supervised the physical document shredding on June 12. Likewise, electronic documents were wiped from the Grapevine desktop after Jarvis contemplated

litigation, triggering a duty to preserve them. Fourth, Plaintiff has not credibly explained why these documents were destroyed instead of preserved. Jarvis testified at one point that he ordered the documents to be destroyed, but he testified at trial that he did not even know it was happening at the time it occurred. Jarvis and Stuart at one point said that they destroyed the documents for security reasons arising from their "open-concept" office environment, but pictures introduced as exhibits at trial establish that the Grapevine office is a normal office with locking doors. Jarvis's inability to explain why the documents were destroyed, despite anticipated litigation, weighs heavily in favor of bad faith.

Defendants have established the spoliation of physical and electronic evidence that should have been preserved.

### B. Monetary sanctions are warranted for the destruction of physical evidence.

Having found that Jarvis committed spoliation of physical paper evidence, the Court concludes that monetary sanctions are appropriate. A five-factor test governs the propriety of sanctions when physical evidence is destroyed: (1) the importance of the evidence destroyed, (2) the culpability of the offending party, (3) fundamental fairness, (4) alternative sources of the information obtainable from the evidence destroyed, and (5) the possible effectiveness of other sanctions less severe than

dismissal. *Story v. RAJ Properties, Inc.*, 909 So.2d 797, 803 (Ala. 2005).[6] These factors point toward the imposition of monetary sanctions.

First, the physical evidence destroyed was arguably not very important. Matlock's affidavit characterized the documents as financial records reflecting ongoing management or other "miscellaneous captive documents." These documents were certainly relevant to this litigation, but there is no reason to believe they held any smoking guns. For example, it is not likely that, whenever Jarvis sent an email about PLLCs, he hurried to print out a copy and store it in a box. Moreover, Jarvis has admitted at trial that he discussed PLLCs with everyone and that he marketed captives with JarvisTower. While the shredded client files are certainly relevant, they are not particularly important.

Second, the culpability of the offending party is grave. Jarvis admitted in an affidavit that he authorized document shredding but backed away from that testimony at trial, claiming that he had been out of the country. Stuart said that she shredded the documents on Jarvis's instructions ten days after his counsel had received a letter requesting document preservation. Whether or not the dissembling was intentional, the culpability is greatly increased by the proposed justification:

---

[6] Although federal law governs the imposition of sanctions in a diversity suit because they are an evidentiary matter, the Eleventh Circuit looks to factors enumerated by state law when "evaluating the need for sanctions, because federal law does not set forth specific guidelines regarding sanctions for spoliation." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005).

both Jarvis and Stuart claimed that they had destroyed the documents because the Grapevine office was "open concept." This modern term has a specific and unmistakable connotation: an "office in which numerous desks were situated in a large open space with no partitions." *Moriarty v. Dyson, Inc.*, 2010 WL 2745969, at *1 (N.D. Ill. July 8, 2010). But, at trial, Defendants presented photos of the office space to the Court. Grapevine is far from an open-concept office. It has walls, locking doors, and hallways. This mischaracterization may not have been intentional, but it is an obvious post hoc justification for destroying documents even though they should have been preserved.

Third, although the loss of this evidence is not ideal, it is not "fundamentally unfair" to ask Defendants to "defend themselves" without it. *Story v. RAJ Properties, Inc.*, 909 So. 2d 797, 805 (Ala. 2005). In *Story*, the plaintiff sued a building company for making his house with defective synthetic stucco, but before the company could inspect the damaged material, the plaintiff removed all of it and had the house repaired. The court in *Story* ruled that it would be fundamentally unfair to ask the company to defend itself without the ability to examine the damaged material. Here, Defendants are not missing any such dispositive or crucial evidence.

Fourth, there are alternative sources of information about Jarvis's activities before and after the deal. Defendants' main complaint is not the absence of evidence on a critical issue; it is that the available evidence does not support their theories, so

they want some more. For example, if Defendants want evidence about what Jarvis said to his clients about their plans to surrender captives, they do not need documents; they need to ask the clients. They did, and Drs. Aggarwal and Playfair testified that Jarvis encouraged them to keep their captives open. Case-ending spoliation sanctions are not appropriate just because one party's document destruction prevents another party's fishing expedition. The Court also finds it relevant that Defendants chose to terminate Jarvis based on allegations of misconduct and only later sought to develop evidence through civil discovery about whether their allegations were true. Usually, an employer develops evidence that justifies a termination *before the termination*.

Fifth, and finally, the Court finds that there is a sanction other than dismissal that is better suited to handling the misconduct at issue here. The destroyed evidence was not going to be dispositive as to any of Defendants' claims. But Jarvis's flouting of the rules cannot go unaddressed. The Supreme Court of Alabama has held that monetary sanctions can be appropriate for the destruction of physical evidence where spoliation does not render a party unable to bring a claim. *See Smith v. Atkinson*, 771 So. 2d 429, 437 (Ala. 2000). Accordingly, monetary sanctions are appropriate to serve the purposes of deterrence and fairness. *See, e.g.*, *T & E Inv. Grp. LLC v. Faulkner*, 2014 WL 550596, at *19 (N.D. Tex. Feb. 12, 2014) (a monetary sanction "like an[] adverse inference instruction…can deter spoliation and

32

compensate the moving party for additional costs incurred."); *Herman v. City of New York*, 2020 WL 873970, at *11 (E.D.N.Y. Feb. 18, 2020) (holding that monetary sanctions, and not an adverse inference, were appropriate even though the spoliating party had been "grossly negligent" because, although a police officer's notes might have provided more detail, the electronic record was sufficient for Plaintiff's claim).

**C. A sanction is appropriate for deleting electronic files.**

A monetary sanction is also appropriate for the deleted computer files. Rule 37(e) provides that a court, "upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice." If a court finds "that the party acted with the intent to deprive another party of the information's use in the litigation," then the court may "presume that the lost information was unfavorable to the party, instruct the jury that it may or must presume the information was unfavorable to the party, or dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e).

Defendants have been prejudiced by the deletion of files. The committee notes on 37(e) provide that "[t]he rule does not place a burden of proving or disproving prejudice on one party....[T]he content to the lost information may be fairly evident...or the abundance of preserved information may appear sufficient...The rule leaves judges with discretion to determine how best to assess prejudice in particular cases." Here, Defendants' forensic expert has provided clues to potential

prejudice by recovering files with suggestive titles. Defendants have provided a "demonstrative list" of these files that suggests they are relevant to this litigation and may have helped Defendants prove their claims. One of the files, an article written by Jarvis, has a section titled "reasons to close down a captive." Such an article would obviously be relevant to Defendants' claim that Jarvis was encouraging clients to shut down their captives. While these files were recovered, and therefore not effectively spoliated, their existence and non-production encourages a finding that the other destroyed electronic files are also relevant to this litigation. Specifically, Defendants located the titles of certain documents, including "Gerry's Insurance Proposal" and "Marketing Piece," but were unable to locate the substance of either document.

The Court also finds that these documents were deleted with the intent to deprive. "Rule 37(e)(2) deals with more severe measures, but they may be used only if the court finds that the party that failed to preserve the information acted with the intent to deprive another party of the information's use in the litigation." 8B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2284.2 (3d ed. 1998). Courts in the Eleventh Circuit have held that the bad faith test in *Calixto* is the test for "intent to deprive" under Rule 37(e). *See Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 746 (N.D. Ala. 2017); *Living Color Enterprises, Inc. v. New Era Aquaculture, Ltd.*, 2016 WL 1105297, at *6 (S.D. Fla. Mar. 22, 2016).

As explained above, Defendants have ample evidence of bad faith under the *Calixto* test.

For the same reasons as explained above with respect to the paper documents, monetary sanctions are appropriate here. Many federal courts have concluded that monetary sanctions are appropriate in situations where the missing evidence is not dispositive.[7] It is highly likely that these computer files are relevant, but, as with the missing paper documents, it is highly unlikely that they would have materially changed the case. For example, these files cannot change the fact that, after years of discovery, Defendants have not found a single current or former client to testify that Jarvis advised them to close their captive insurance company.

*          *          *

Both tangible evidence and electronically stored information was spoliated with the knowledge of impending litigation.  This conduct is exacerbated by Jarvis's

---

[7] *Ahcom, Ltd. v. Smeding*, 2011 WL 3443499, at *8 (N.D. Cal. Aug. 8, 2011) (holding that even though a party wiped a computer "in the course of cleaning up after bankruptcy" in spite of multiple discovery requests and deposition notifications of the need for the information, only monetary sanctions were appropriate where the information sought was "unlikely to have materially impacted the case."); *PersonalWeb Techs., LLC v. Google Inc.*, 2014 WL 5422933, at *3 (N.D. Cal. Oct. 24, 2014) (affirming magistrate judge's decision to impose only monetary sanctions where bad faith was found and the monetary sanctions could be adjusted to the degree of prejudice, which was not great); *Stream Companies, Inc. v. Windward Advert.*, 2013 WL 3761281, at *5 (E.D. Pa. July 17, 2013) (holding that monetary sanctions were appropriate where emails were deleted, evidence of bad faith conduct was "strong," and the conduct had "significantly hamstrung" plaintiff's efforts); *Padgett v. City of Monte Sereno*, 2007 WL 878575, at *4 (N.D. Cal. Mar. 20, 2007) (holding that monetary sanctions were appropriate for destruction in bad faith).

confused and misleading attempts to justify it.  Therefore, the Court will award Taylor, Chandler, Johnson, and TaylorChandler all costs and fees associated with the evidence that was spoliated.  *See*, *e.g.*, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 510 (E.D. Va. 2011).

## II.    Except for Count VII, Defendants' counterclaims fail.

In a real sense, Defendants are the plaintiffs in this case. They started the legal fight by terminating Jarvis for alleged breach of contract, and they cite his pre-deal conduct as a reason not to pay him the remainder of the purchase price. Accordingly, the Court will deal with their claims first.

Defendants Taylor, Chandler, Johnson, and TaylorChandler allege seven counts against Jarvis.[8] Count I is alleged only by Defendant TaylorChandler, because, even though the first paragraph of the count says that "Defendants adopt all preceding allegations," TaylorChandler was the only Defendant signatory to the employment agreement and only TaylorChandler claims injury as a result of Jarvis's alleged breach thereof.  Count VIII (fraud) and IX (suppression) relate to activity that took place before the signing of the contract; Defendants allege that Jarvis knowingly provided misleading information about Jade Risk's financials and knowingly omitted other information.  Five counts are based on Jarvis's contractual

---

[8] Defendants voluntarily dismissed Count VI of the Second Amended Counterclaim at trial.

duties and other actions he took that Defendants view as disloyal: Count I (breach of the employment agreement), II (breach of the restrictive covenants agreement), III (breach of the membership purchase agreement), IV (breach of fiduciary duty to Jade Risk), and V (breach of fiduciary duty to TaylorChandler). Finally, Count VII (conversion) is about a Jade Risk laptop that Jarvis has not returned and that Defendants claim as their property.

### A. Fraud (Count VIII) and Suppression (Count IX) – Jarvis did not misrepresent or fail to disclose the true state of Jade Risk's book of business.

As the relevant factual allegations are the same and the failure of the counts turns on the same elements, the Court will address the fraud and suppression counts in tandem. In Alabama, "[t]he elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation." *Exxon Mobil Corp. v. Alabama Dep't of Conservation & Nat. Res.*, 986 So. 2d 1093, 1114 (Ala. 2007) (emphasis in original). The complaining party must have been induced to act to its injury. *See id.* The elements of a suppression claim in Alabama are "(1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury." *Freightliner, LLC. v. Whatley Contract Carriers, LLC.*, 932 So. 2d 883, 891 (Ala. 2005).

The Court finds as fact that Jarvis did not tell Defendants anything false or suppress anything true that reasonably induced reliance. Defendants allege that, through informal representations, Jarvis promised 75 total captives would materialize soon after the acquisition. Defendants purportedly arrived at their expectation of 75 captives by adding the list of "engaged" captives in a July 10 email to the total number of active, committed, and engaged captives present on a 2015 Jade Risk financial spreadsheet. The evidence at trial did not support these allegations.

First, Jarvis never told Defendants that Jade had seventy-five captives under management or that Defendants would acquire seventy-five captives shortly after completing the deal. Defendants' allegations of fraud are based on two documents. The first is a record documenting 2015 Jade Risk operating expenses that Jarvis sent to Chandler. This list includes fifty-eight captive insurance companies, of which Defendants chose nine as the basis for their fraud claims. Eight of these nine are listed as "engaged."[9] The second document is an email Jarvis sent in July of 2016 with bulleted updates for Defendants regarding Jade Risk's business outlook.

_____

[9] They claim Steele, Treliant 3, Mitchell Prop, JD Long 1, JD Long 2, CSS, Ball Ventures, and Ball Ventures II never formed. The ninth, Providence, was listed as an active captive instead of an engaged one. It was not listed in Matlock's final pre-deal email. The fraud analysis for an active captive is easier. Even though no engaged captives were listed in Stephanie Matlock's final August email, it is conceivable that an assurance concerning them might still be part of the deal as they are ephemeral by nature and Jarvis might be working behind the scenes still to bring them to fruition. What is not conceivable is that, even though the email purported to list all active captives, Defendants relied on Jarvis to have one that wasn't included.

In their closing argument, Defendants claimed that "Mr. Jarvis promised" these captives. Taylor testified that Defendants decided not to pay Jarvis's promissory note because "engaged and committed" captives were "not there anymore." Having reviewed these communications and observed these witnesses at trial, the Court finds that Jarvis never promised seventy-five captives under management or suppressed the number of captives under management. These documents were updates about Jarvis's ongoing efforts to solicit business; he sent them to people who would be his supervisors after the deal was finalized. He used loose language about potential future business. But it was not fraudulent.

Second, Defendants did not rely on the notion that they would have seventy-five captives under management. Instead, there was overwhelming evidence presented at trial that the parties expected approximately thirty-six captives to come shortly after the deal. Taylor stated in his deposition that, although he wasn't sure how many captives the purchasers were expecting, he "believe[d] it was 39." Johnson stated in his deposition that the purchasers expected only thirty-six. Thirty-six was the only captive quantity listed in the agreements; by hitting that number, Jarvis would earn a 2017 salary. If either party had expected the deal to yield seventy-five captives, it would have made no sense to set the quota for Jarvis's incentive pay at thirty-six.

Chandler testified that the original purchase price was based on the multiplication of seventy-five by a set value because he assumed the deal would net the new company seventy-five new captives to manage.[10] But the Court finds that assertion not credible. Chandler sent an email discussing a purchase price of $3 million on December 14, 2015, eight months before (based on his testimony) he came up with the seventy-five-captive figure.  Moreover, it was undisputed that Jarvis made concessions on the $3,000,000 purchase price so that some of it would be contingent on future performance. Those performance-based concessions are keyed to annual revenue targets and having thirty-six captives under management. Had the purchase price been based on the expectation that seventy-five captives would be under management, the incentives would have been based on a target somewhere in that range. Defendants' position that they believed they would acquire seventy-five captives as part of the deal is contrary to the evidence.

Third, and in any event, Defendants cannot show that it was reasonable for them to rely on an expectation of 75 captives. In Alabama, reliance is not reasonable "if the circumstances are such that a reasonably prudent person who exercised

---

[10] Defendants put forward Chandler as a non-retained expert witness and provided a limited witness disclosure. Jarvis objected to this disclosure. Jarvis also filed a motion to strike Defendants' new damages theory, which includes Chandler's calculations. *See* Doc. 179. These motions are denied. First, the damages theory is moot in light of the Court's conclusions on the fraud and suppression claims.  Second, the declaration in which the damages calculations appear is merely a correction of previous testimony.  Finally, the Court finds that Chandler's disclosures adequately addressed his opinions about captive management insurance at trial.

ordinary care would have discovered the true facts before acting on the alleged misrepresentation." *Exxon Mobil Corp.* 986 So. 2d at 1114.  Here, before the deal closed, Defendants continued to receive updates about the number of captives under management. But Defendants closed anyway.

In addition to their general allegation that Jarvis promised seventy-five captives under management and did not deliver, Defendants argue that Jarvis suppressed information about captives that were dissolving or terminating. The Court finds that Jarvis did not suppress this information. First, it is undisputed that Jarvis helped shutter a series of captives known as the "Cliffs" so their assets could be used to form a PLLC. But this information was disclosed to Defendants before the deal closed through Matlock's emails. After the deal had closed, Jarvis helped the family office underlying the Cliffs to form new captives with Arsenal. Second, Defendants contend that Jarvis suppressed his attempts to convince D'Alessandro, Playfair, and Aggarwal to shut down their captives, but these allegations have been exposed as unsubstantiated throughout the course of the trial.  Playfair and Aggarwal themselves have explicitly denied the accusations, and Taylor admitted on the stand that he asked Jarvis to speak to D'Alessandro about insurance. Finally, the final pre-closing email Defendants received from Jade Risk correctly identified the captives that were remaining and those that were closing. Jarvis is not liable for suppressing information about existing captives that were closing.

Defendants' fraud and suppression claims fail.

## B. Breach of the Employment Agreement (Count I) – Jarvis did not fail to perform his obligations under the contract.

In addition to their fraud claims, Defendants main contention at trial was that Jarvis breached the employment agreement. It is incumbent upon Jarvis, under Section 2 of the employment agreement, to promote the interests of Defendants within the scope of his employment. Defendants accuse Jarvis of breaching the employment agreement by, "among other reasons," failing to promote their interests because he encouraged captive clients to dissolve and form new limited liability companies that could purchase life insurance from JarvisTower. As evidence, Defendants point to clients who surrendered their captives after contact with Jarvis and clients to whom Jarvis marketed PLLCs. Jarvis denies encouraging any captive to surrender and believes that the creation of a PLLC is not mutually exclusive with the maintenance of a captive insurance company.

In Alabama, "to recover on a breach-of-contract claim, a party must establish: (1) the existence of a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) damages." *Capmark Bank v. RGR, LLC*, 81 So. 3d 1258, 1267 (Ala. 2011). It is undisputed that the contract between the parties was valid.

Jarvis's full contractual performance is discussed below. Here, it is enough to say that the Court finds that Jarvis did not fail to perform his obligations under the

contract by encouraging clients to dissolve their captives or marketing a PLLC structure as a way to remove capital from a captive insurance company. Defendants allege that Jarvis encouraged clients to dissolve their captives and to funnel those funds into PLLCs. At trial, they cited four examples: Dr. Aggarwal, Dr. Playfair, Steven Sands, and Gerry D'Alessandro. Both Aggarwal and Playfair testified in their depositions that Jarvis never advised them to shut down their captives. The Court finds the deposition testimony of Aggarwal and Playfair to be credible. They had no reason to lie.

Although neither Sands nor D'Alessandro were deposed, the record makes clear that Jarvis did not encourage them to surrender their captives. Instead, Jarvis introduced Sands and D'Alessandro to the PLLC model of removing capital from a captive insurance company in a tax-advantaged way. The only question is whether there is something uniquely inconsistent with that model and the maintenance of a captive insurance company. The Court finds that there is not.

Jarvis's PLLC model is an aggressive tax strategy to unwind a captive's investments after it has run its useful life, but it is not the same thing as advocating for a captive insurance company to dissolve. The Court posed numerous questions to Defendants during trial about why they contended the PLLC model was inconsistent with captive insurance. And the Court was consistently unsatisfied by their answers. Defendants obviously have a skeptical view of Jarvis's tax avoidance

strategy, but Defendants could never explain how Jarvis's actions undermined their ability to make money managing captive insurance companies.

The Court also notes that Jarvis performed work as assigned. Jarvis was hired to maintain and increase the captive insurance business of Arsenal. He came up with a plan to do this: he would market himself as a financial guru with a boutique financial consulting firm and refer captive clients to Arsenal. He referred to this plan in a text with Chandler as early as January 2017. He made this strategy explicit in the marketing plan he sent to Taylor, Chandler, and Johnson. The three men registered no systemic issues or complaints with Jarvis's plan. And Defendants concede that Jarvis originated at least eight captive insurance companies. Having reviewed the entire record, observed the key players testify at trial, and posed its own questions about this matter during the trial, the Court finds that Jarvis did not breach his duties in the way Defendants allege.

### C. Breach of the Restrictive Covenants Agreement (Count II) – Jarvis did not compete with TaylorChandler or misuse the company's proprietary information.

If Defendants' Count I alleges a sin of omission, Count II accuses Jarvis of a sin of commission. Specifically, Defendants accuse Jarvis of persuading captive clients to close so that he could set up PLLCs, but this time in the context of sections 2, 3, and 4 of the Restrictive Covenants Agreement. These sections pertain to non-disclosure of confidential information, non-competition, and non-solicitation

respectively. A unique allegation in this section of the operative complaint is that

Jarvis used proprietary materials from Jade Risk, now owned by Defendants, to

market the services of JarvisTower. In Alabama, "restrictive covenants will be

recognized and enforced when established by contract, but they are not favored and

will be strictly construed." *Slaby v. Mountain River Estates Residential Ass'n, Inc.*,

100 So. 3d 569, 578 (Ala. Civ. App. 2012).

The exact language of each section is important:

Section 2 – Non-Disclosure of Confidential Information.  Jarvis
acknowledges that the Confidential Information[11] obtained by him
while he was an employee, member, manager or officer of [Jade Risk]
is the property of [Jade Risk].  Jarvis agrees that he shall not, during the
Restricted Period,[12] disclose nor use for his own or any other purposes
any Confidential Information without the prior written consent of
[Defendants], unless and to the extent that (a) the Confidential
Information becomes generally known to, and available for use by, the
public other than as a result of Jarvis' acts or omissions or (b) Jarvis is
ordered by a court of competent jurisdiction to disclose Confidential
Information;…

Section 3 – Non-Competition.  Jarvis acknowledges that in the course
of his management of and direct or indirect ownership in [Jade Risk]
he has to become familiar with [Jade Risk's] trade secrets and with
other Confidential Information concerning the Company, including but
not limited to, client lists and referral sources, and that his services have
been of special, unique and extraordinary value to the Company.  Jarvis
agrees that during the Restricted Period he shall not, directly or

---

[11] A precise description of the term "Confidential Information" can be found in Section 1, but, for
the sake of concision, the definition lists every conceivable form of work product that Jarvis could
have produced while working at Jade Risk.  Both the Smith Paving Case Study, as well as the
brochures he is accused of handing out at meetings fall under subsection (vi) of the definition
section, which labels as "Confidential Information" any "notes, analysis, compilations, studies,
summaries, or other material prepared by or for [Jade Risk]…"

[12] This period lasts at least for two years following the execution of the agreement.

indirectly, anywhere in the Applicable Area, on his own account, or as an employee, consultant, agent, partner, joint venture, owner or officer of any other person, firm, partnership, corporation or other entity, or through his wife's ownership of entities or her activities, or in any other capacity:

(a) act in a capacity, or provide services, similar to those in which Jarvis acted or which Jarvis provided for the Company, for any entity that engages in business that (i) is the same as, or substantially similar to, the Business, or (ii) directly or indirectly competes with the Business;

(b) supervise, manage or oversee others engaging in any of the activities described above;

(c) engage in the Business or otherwise engage in any business, venture or activity that is competitive with the Business; or

(d) own any interest in, consult with, render services to or otherwise assist any person that does any of the foregoing.

Nothing herein shall prohibit Jarvis from (A) being a passive owner of not more than one percent (1%) of the outstanding stock of any class of a corporation which is publicly traded, so long as Jarvis has no active participation in the business of such corporation, nor (B)participation in an Excluded Business as defined in the Employment Agreement by and between Jarvis and TaylorChandler, LLC, dated the same date herewith (the "Employment Agreement").

<u>Section 4</u> - Non-Solicitation. During the Restricted Period, Jarvis shall not directly or indirectly in any manner (whether as an owner, officer, director, partner, employee, contractor, consultant or otherwise) (i) solicit or induce or attempt to solicit or induce any employee of, or consultant to, the Company or Affiliates, to leave the employ of the Company or Affiliates, or in any way interfere with the relationship between the Company or Affiliates, and any of their employees or consultants, (ii) hire any person who was an employee of or consultant to the Company or Affiliates (provided, however that Jarvis may hire former employees and consultants to the Company or Affiliates after such former employees or consultants have ceased to be employed or otherwise engaged by the Company or Affiliates for a period of at least twelve(12) months), (iii) call on, solicit or service any customer of the Company or Affiliates with the intent of selling or attempting to sell any service or product similar to the Business provided by the Company

or Affiliates, (iv) call on or solicit any vendor or supplier of the Company or Affiliates with the intent of obtaining products or Services that the Company or Affiliates obtained from that supplier and that are used in or relate to the Business provided by the Company or Affiliates, or (v) in any way interfere with the relationship between any customer, vendor, supplier, licensee or other business relation and the Company or Affiliates (including, without limitation, making any negative or disparaging statements or communications regarding the Company, Affiliates or any of their operations, officers, members, managers or investors).

Defendants argue that Jarvis breached the restrictive covenants agreement in four ways. The Court finds that Jarvis did not breach the restrictive covenants agreement.

First, Defendants allege that "Jarvis used confidential information about the captive clients of Jade Risk LLC to promote JarvisTower to persuade them to shut down so that he could establish limited liability companies…in violation of Sections 2, 3, and 4 of the Restrictive Covenants Agreement." Doc. 89 ¶113.  In Section 1 of the restrictive covenants agreement, "information regarding [Jade Risk] customers and suppliers of [Jade Risk's captive management services]" falls under the definition of "Confidential Information." Therefore, any information about Jade Risk customers that Jarvis might have used qualifies as confidential information.

Presumably this allegation is a reference to Jarvis's alleged use of clients' contact information to communicate about PLLCs, but Defendants made no mention at trial of Jarvis's misuse of clients' confidential information. Defendants did not elicit witness testimony, articulate argument, or in any way prosecute this alleged

misuse of confidential client information. Because no evidence relating to the misuse of client information was adduced at trial, Defendants have not met their burden and the Court concludes that Jarvis did not misuse confidential client information within the meaning of the restrictive covenants agreement. *See*, *e.g.*, *In re Hirsch*, 36 B.R. 643, 647 (Bankr. S.D. Fla. 1984) (holding that, "although included in the complaint, at trial plaintiffs did not press the argument that the conversion of whole life insurance to term insurance prior to bankruptcy was a fraudulent transfer, and the court believes that there is no basis for such a conclusion. Therefore, there is no ground upon which the debtors' discharges should be denied.").

Second, Defendants allege that "Jarvis' creation of JarvisTower and its promotions were in direct competition with the Companies and in violation of Section 3 of the Restrictive Covenants Agreement." Doc. 89 ¶114. This allegation is answered by a comparison of the business of JarvisTower and the "Business" defined in the restrictive covenants agreement.[13] "Business" is defined as Jade Risk's "current business of providing captive management services," which is the "oversight of licensing, underwriting, claims, accounting and regulatory reporting of a privately held insurance company." The employment agreement specifically provides that "[f]or avoidance of doubt, [Jarvis] is allowed to pursue other types of

---

[13] The last paragraph of Section 3 states that Jarvis may participate in "an Excluded Business as defined in the Employment Agreement." But no such term is defined in the employment agreement.

insurance, financial planning and other business that are (sic) not competitive with the 'Business' described in the Restrictive Covenants Agreement."  Therefore, if JarvisTower engaged in the management of captive insurance companies, Jarvis would be in violation of this agreement. However, at no point during the litigation have Defendants alleged that JarvisTower managed any captive insurance companies. It was undisputed at trial that JarvisTower had no captive management license. Chandler testified that he knew JarvisTower was not managing captives, that the definition of "Business" was limited to captive management, and that his sole evidence of competition was Jarvis's "continued insistence on marketing JarvisTower." The Court finds as fact that JarvisTower was never engaged in the management of captive insurance companies.

Defendants also rely on Sections 3 and 4 of the restrictive covenants agreement. Section 3 provides that Jarvis may not directly or indirectly provide services similar to those he provided for Jade Risk for any entity that engages in business substantially similar to the provision of captive management services.  He also may not consult with any person who works for a company that competes with Jade Risk's provision of captive management services. Section 4 provides that Jarvis may not directly or indirectly solicit any customer of Jade Risk with the intent of selling any service or product similar to captive management or interfere with the relationship between Defendants and their clients.

Defendants argue that Jarvis's activity in pitching his PLLC model indirectly competed with their management of captive insurance companies. Defendants analogize to *Benchmark Medical Holdings, Inc. v. Rehab Solutions, LLC*, 307 F. Supp.2d 1249 (M.D. Ala. 2004), where a man named Rocky sold his rehab clinic called "Rehab Associates" to a medical management company, signed a non-compete that would last five years and required him to devote his "full business time and attention to the performance of his duties and responsibilities," and then a year later promptly violated the whole thing by forming a new rehab company called "Rehab Solutions" in his living room. This case is different for a host of obvious reasons. The dispositive one, though, is that Jarvis and Rocky signed materially different agreements. Rocky was required by his employment agreement to commit his full time to his new job, but Jarvis's employment agreement expressly gave him the freedom to pursue another financial consultancy as long as he did not compete with Defendants' captive management business. Defendants' view of competition— i.e., Jarvis spending his time on another finance-related project instead of marketing captive insurance companies—would effectively eliminate this provision from their agreement.

Third, in the termination letter sent to Jarvis on May 25, 2017, Defendants allege that Jarvis conducted a webinar "without any references to services provided by the Companies and holding JarvisTower out as a direct competitor to the

Companies." At trial, Chandler confirmed that this statement was a reference to the April webinar. However, the April webinar mentions that Arsenal was named the "captive manager of the year" and also uses the "Arsenal Insurance Management" header on the Smith Paving Case Study. The Court finds as fact that Jarvis mentioned Arsenal and made its services explicit in his webinar. The webinar also did not suggest that JarvisTower provided captive management services in competition with Arsenal.

The Court also finds highly persuasive Jarvis's testimony that he had no financial incentive to compete with Arsenal, sabotage its activities, or misuse its information. Jarvis's compensation with Arsenal was commission-based. Because JarvisTower had no way to establish or manage a captive insurance company, Jarvis depended on his relationship with Arsenal to monetize captive insurance leads that he generated. His email communications announced an explicit plan to market captives and stated that his marketing activities would be paid for by JarvisTower. Defendants approved this plan.

Fourth, Defendants allege that Jarvis used "case studies and Jade Risk seminar materials in conducting certain webinars…" Doc. 89 ¶115. At trial, only two webinar documents were mentioned in relation to confidentiality. The first was a Jade Risk informational brochure Jarvis rebranded for JarvisTower. The second was the Smith Paving Case Study; a hypothetical study that Jarvis created to show the tax benefits

of using a captive. Under Section 1 of the restrictive covenants agreement, a "summary" or "stud[y]" that is "based, in whole or in part" on "information relating to the…processes" of the captive management business qualifies as confidential.

Neither of these materials were confidential—they were expressly designed to be disseminated to potential clients. Although they contradicted this position at trial, neither Taylor nor Johnson believed that the Smith Paving Case Study qualified as confidential when they were deposed. Taylor testified that he was upset to learn about the presentation format of the April webinar. When asked about the webinar invite Jarvis had sent him, Taylor responded, "I didn't know what was going on." Chandler testified that the Case Study was not identified as confidential in the termination letter and that, although he never told Jarvis not to use it, he had removed it from a marketing materials folder. This refers to a comment attached to an item below the Case Study on the marketing plan that reads "cut a good bit of the tax and estate planning talk." Jarvis was never told not to use the Case Study and it escaped any negative comment in the marketing plan. The Court finds as fact that Defendants approved its use.

There is similar confusion over the brochure. Much of what it contained was public information about the process of captive formation. None of the Defendants addressed the confidential status of the brochure at trial. Although Jarvis did not explicitly reference rebranding Jade Risk materials for JarvisTower, he referenced

rebranding in the marketing plan and that JarvisTower would be bearing the cost of his marketing scheme.  The Court finds as fact that Jarvis's use of the brochure was implicitly approved.

In short, Jarvis presented JarvisTower as a vehicle to drive sales and produce referrals. Although this may have been an unusual way to perform his contractual obligations, there is no evidence that JarvisTower was engaged in captive management or that Jarvis engaged in the unauthorized use of confidential or proprietary information. Defendants failed to provide Jarvis with a job description and tacitly approved the creation of his new brokerage. They also explicitly approved Jarvis's marketing plan which included rebranding and JarvisTower. Jarvis did not violate the restrictive covenants agreement.

### D. Breach of Fiduciary Duty to Jade Risk (Count IV) and TaylorChandler (Count V) – Jarvis did not breach his fiduciary duties to JadeRisk or TaylorChandler.

Without referring to specific events, Defendants allege in Counts IV and V that Jarvis breached his fiduciary duties to Jade Risk and TaylorChandler under Alabama Code § 10A-5A-4.08, which governs those with responsibilities for direction and oversight in limited liability companies. *See* Doc. 89 ¶132, ¶122-125. As the duties owed to each and the offenses against each are identical, the counts are disposed of in tandem.  The duties owed are those of loyalty and care. *See Brooks v. Hill*, 717 So. 2d 759, 764 (Ala. 1998).  To establish that one of these duties was

violated, Defendants must show the existence of the duty, a breach, and damage suffered as a result. *See Aliant Bank, a Div. of USAmeribank v. Four Star Investments, Inc.*, 244 So. 3d 896, 907 (Ala. 2017). These duties are not excused by inefficiency on the part of Taylor, Chandler, or Johnson.  At trial, Jarvis testified that he took certain actions, such as changing phone lines, because TaylorChandler was not moving quickly enough.   However, it is settled law in Alabama that, when judging actions that may violate a fiduciary duty, the efficiency of the employer is immaterial. *See Edwards v. Allied Home Mortg. Capital Corp.*, 962 So. 2d 194, 207 (Ala. 2007).

In Alabama, the fiduciary duty owed by a corporate director "is divided into two parts: a duty of care, which requires officers and directors to act as ordinarily prudent and diligent men under similar circumstances, and a duty of loyalty, which prohibits faithlessness and self-dealing by corporate directors." *Massey v. Disc Mfg., Inc.*, 601 So. 2d 449, 456 (Ala. 1992).  Although fiduciary duties were not mentioned by Defendants at trial, Jarvis's marketing efforts comported with his duty of care and his PLLC activities comported with his duty of loyalty. Jarvis violated no fiduciary duties owed to TaylorChandler or Jade Risk.

Defendants claim that Jarvis promulgated information adverse to captives, such as mentioning in one presentation that people should wait to form captives in the current regulatory environment. Jarvis also sent an email to prospective clients

that listed things to do before shutting down a captive. However, the federal regulatory environment surrounding captives at the end of 2016 was hostile. Chandler testified that IRS Policy 2016-66 scared people and caused captive formations to decline across the industry. Some clients, such as Aggarwal, feared that 2016-66 put them in danger of crossing the IRS. In some jurisdictions, marketing a product that one knows is dangerous is enough to violate the duty of care in negligence law. *See*, *e.g.*, *Lance v. Wyeth*, 85 A.3d 434, 458 (Penn. 2014). In this instance, Jarvis did nothing to violate his duty. Because Jarvis's marketing strategy involved increasing his profile as a financial consultant, his credibility in that role was of paramount importance. The Court concludes that Jarvis acted as an ordinarily prudent man would have under similar circumstances.

Jarvis also did not take any action that was "faithless" or "self-dealing," as opposed to directly competitive. Here, Jarvis is accused of telling current clients about the benefits of a PLLC as a way to wind down a captive insurance company. As discussed above, Jarvis's advice about PLLCs was not a breach of his employment agreement. In fact, he was explicitly permitted to engage in any business that was not the management of captive insurance companies.

### E. Breach of the Purchase Agreement (Count III) – Jarvis did not fail to perform his obligations under the purchase agreement.

Finally, Defendants allege that Jarvis materially breached the membership interest purchase agreement by "making false and/or materially misleading

statements or omitting material information with respect to the financial disclosures" and "by failing to cooperate with [Defendants] to continue and maintain client relationships…" Doc. 89 at 15-16. Jarvis had a duty to make financial disclosures under Sections 2.3, 2.5, and 2.11 of the purchase agreement as well as a duty to help maintain existing Jade Risk clients under Section 4.1. Defendants' factual contentions here are identical to the factual contentions that underlie Counts VIII and IX—that Jarvis lied about the financial condition of Jade Risk and promised to deliver captives that he did not deliver. They also allege that Jarvis breached these duties when he allegedly encouraged clients to close their captives and started a competing business, which are the same contentions that underlie Counts II, IV, and V.

As the Court discussed above, Jarvis did not misrepresent or suppress information, compete with the company, or violate his fiduciary duties. Defendants' breach of contract claim regarding the purchase agreement fails for the same reasons that the rest of Defendants' claims fail.

### F. Conversion (Count VII) – Jarvis's laptop must be returned to TaylorChandler.

Even before this litigation, Jarvis has maintained possession and control of a MacBook Pro laptop that was listed as a business expense on Jade Risk's tax forms and was therefore ostensibly the property of Jade Risk at the time it was bought by TaylorChandler. Doc. 89 at ¶148. Because Defendants acquired all rights to Jade

Risk, they lay claim to the laptop and allege that Jarvis's possession of it amounts to conversion. Jarvis has refused to return it. To establish conversion in Alabama, "a plaintiff must show a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property." *Huntsville Golf Dev., Inc. v. Ratcliff, Inc.*, 646 So. 2d 1334, 1336 (Ala. 1994).

The Court finds that Jarvis converted the laptop. At trial, Jarvis testified that, prior to the deal, he and his passive partner in Jade Risk, Dr. Anderson, had made distributions to themselves of their individual laptops. Jarvis has also stated that he cannot find any documentation supporting this claim. However, Defendants have shown that the laptop appeared on a tax asset detail report that names the laptop as a Jade Risk tax asset for the entire 2016 year. Because TaylorChandler acquired Jade Risk in September of 2016 and the laptop was still on the Jade Risk tax asset detail report as of December, the laptop belonged to TaylorChandler as of the day of acquisition. Jarvis has converted the laptop by refusing to return it.

### III.   Jarvis has established breach of the employment agreement and promissory note.

Jarvis alleges five counts against Defendants.[14] Counts IV (breach of the employment agreement) and VI (breach of the promissory note) relate to Jarvis's

---

[14] Jarvis voluntarily dismissed several counts in the Second Amended Complaint shortly before trial and additional counts during trial.

compensation as an employee and for the sale of the company. Count IV alleges that TaylorChandler owes him origination bonuses, deferred salary, and severance pay. Count VI alleges that the individual defendants, Taylor, Chandler, and Johnson, owe him the remaining purchase price of the company. Counts VII and VIII are both requests for declaratory judgement; if the Court finds against Jarvis on the issue of breach of contract, he argues that he is entitled to a declaratory judgment that he is nonetheless owed money. Finally, Count X is an allegation of civil conspiracy; Jarvis believes that Taylor, Chandler, Johnson, and TaylorChandler conspired to refuse to pay him in violation of their agreements.

### A. Breach of Employment Agreement (Count IV) - TaylorChandler breached the Employment Agreement.

The employment agreement contains a provision allowing Jarvis deferred compensation and severance pay if he is terminated without cause.  Jarvis alleges he was terminated without cause and Defendants have refused to pay him severance and deferred compensation. "In order to recover on a breach-of-contract claim, a party must establish: (1) the existence of a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) damages." *Capmark Bank v. RGR, LLC*, 81 So. 3d 1258, 1267 (Ala. 2011).  It is undisputed that the contract between the parties is valid.

1.  <u>Jarvis substantively performed.</u>

The Court finds that Jarvis substantially performed his obligations under the contract such that Defendants' performance was triggered. It is axiomatic that if one party substantially performs a contract, not precisely to specifications but enough that the other party has obtained the benefit of the bargain, then the other party must perform as well. The "substantial performance of a contract does not contemplate exact performance of every detail, but performance of all important parts." *Bay City Const. Co. v. Hayes*, 624 So. 2d 1031, 1034 (Ala. 1993).

Jarvis had several duties under the employment agreement. Jarvis needed to promote the interests of Defendants by serving as the Director of Business Development, reporting to the directors of TaylorChandler, maintaining and expanding the captive client base, developing and executing marketing strategies, and coordinating resources and services to drive business. This agreement also prohibited Jarvis from entering the captive insurance management business himself or selling life insurance to captive insurance companies managed by Arsenal without prior written consent.

Jarvis did a great deal in service of Arsenal and TaylorChandler.  In addition to trying to convince clients to maintain their captives in the face of new regulatory scrutiny, Jarvis originated at least eight captives in 2016. Jarvis developed a marketing plan, which he submitted to Defendants. Even before this written plan,

Jarvis informed Defendants that he planned "to continue to build [his] marketing around the 'captive linchpin' strategy" as a "central point for consulting-which will lead to more captive and insurance business." Chandler sent a text message to Jarvis telling him that this was the right direction. Jarvis then submitted a marketing plan to Defendants, prominently including his strategy to promote himself and have JarvisTower pay for it, which they subsequently approved with relatively few additions. Jarvis acted to execute the marketing plan by working on book deals, holding webinars, forming his own consultancy and raising his profile so that he could refer captive business to Arsenal.

Jarvis also did a number of smaller things. Jarvis's employees, Stuart and Plummer, shared process flow research to help Arsenal with a project that ended up saving tens of thousands of dollars. Jarvis did his own research into the creation of a health pool to help ignite Arsenal's business in the area.

Defendants argue that Jarvis breached the employment agreement because he sabotaged their business, advised clients to close down captives, and set up a competing company. The Court has already rejected that position.

2.  Defendants owe Jarvis deferred salary and bonuses.

As a result of Jarvis's substantial performance under the employment agreement, Defendants' obligations under the contracts have come due and Defendants have declined performance. Defendants are now in breach of the

employment agreement. *See e.g. Superior Wall & Paver, LLC v. Gacek*, 73 So. 3d 714, 723 (Ala. Civ. App. 2011) (homeowner was forced to pay a builder, even though the builder had not used the appropriate brand of internal piping specified in the contract, because the builder had substantially performed); *Kohn v. Johnson*, 565 So. 2d 165, 169 (Ala. 1990) (same); *Bruner v. Hines*, 324 So. 2d 265, 269 (Ala. 1975) (same). Specifically, Defendants have not paid Jarvis his deferred salary and 2016 origination bonuses. These monies are due because Jarvis substantially performed his obligations under the contract.

There is no dispute about the amount of Jarvis's deferred salary. It is $175,000.

There is, however, a dispute about the amount of origination bonus Jarvis earned. Section 3.1 of the Employment Agreement provides that Jarvis is entitled to a $20,000 bonus for each new captive that (1) is "originated by" Jarvis; and (2) "becomes licensed after the Effective Date." These monies were due by March 30, 2018 at the latest. Jarvis claims that he originated twenty captives. *See* Doc. 224. Defendants concede that he originated eight captives, but dispute twelve. *See* Doc. 225.

Defendants split the twelve disputed captives into three categories: The Buckleys, the Cliffs, and miscellaneous captives. Six of the disputed captives were created for Buckley Sandler LLP by Jade Risk in Oklahoma. These were

surrendered and replaced with "six new Alabama insurance entities" that assumed "any outstanding risk from the surrendering six Oklahoma entities." The next four were Cliffs, created for the Belmont family office. The Cliffs, named Eastcliff, Edgecliff, Greycliff, and Northcliff, surrendered at the end of 2016, and reformed in Alabama in 2017 under the creative monikers Eastcliff II, Edgecliff II, Greycliff II, and Northcliff II. The final two disputed captives are Cosmetic Surety and Pain Management. Cosmetic Surety was a captive that belonged to Jarvis and he argues that, because he sold it to someone else who was prepared to pay full management fees, he ought to be entitled to a bonus. Pain Management was produced by the same process as the Buckleys and Cliffs; Dr. Dar maintained a captive called Intervention Pain Management with Jade Risk before surrendering that captive and reforming in Alabama under the name Pain Management.

This dispute boils down to the definition of the word "originate." There is no definition of this word in any agreement between the parties. To determine the plain meaning of a word, the Eleventh Circuit looks to the common usage or ordinary meaning of the word and uses dictionary definitions for guidance. *See United States v. McNab*, 331 F.3d 1228, 1237 (11th Cir. 2003); *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001). In its common usage in business, origination involves the development of new clients. *See, e.g., Grewal v. Cuneo Gilbert & LaDuca LLP*, No. 13-CV-6836 (RA), 2017 WL 1215752, at *9 (S.D.N.Y.

Mar. 31, 2017), *aff'd*, 803 F. App'x 457 (2d Cir. 2020) (finding that, despite the ambiguity of the contractual "originate" term, a reasonable juror could find that the plaintiff originated work because she met with dozens of prospective clients and signed forty of them). That was also how the parties used the term here: Jarvis was to be paid a bonus for each *new* client that began to pay Arsenal because of him. He was paid for existing clients in the purchase of Jade Risk.

The term "originate" demands that the substance of the entities be new. But Jarvis did not originate these entities as new clients or new business for TaylorChandler. Instead, he converted the form of certain entities that were already under management into new entities that could be managed by the new company. The Court finds that counting these twelve captives as "employee originated captives" within the meaning of the employment agreement is inappropriate. The Court also finds that Jarvis originated eight captives and is owed $160,000 in bonus payments for those.

   3.  <u>Defendants do not owe Jarvis severance.</u>

Under the employment agreement, Jarvis must be paid severance in the amount of his "average monthly salary" if he is fired without cause. Defendants argue that they had cause to fire Jarvis and that, even if they did not, Jarvis's average monthly salary under the agreement is zero because he never produced a sufficient number of captives. Jarvis argues that he was fired without cause and that his average

monthly salary was $15,000 because that is what, in fact, he was paid on a monthly basis in 2017.  The Court agrees with Jarvis on the first issue but with Defendants on the second.

### a.  Jarvis was fired without cause.

The question of whether an employer has cause to fire an employee is usually simple; an employee does something, his employers warn him not to do so again, and he is fired when he does.  Indeed, in Alabama, if there is a warning, a finding that an individual was terminated for cause will not be found contrary to the weight of the evidence. *See Kelly v. Pate*, 668 So. 2d 32, 34 (Ala. Civ. App. 1995) (neglecting to overturn a lower court finding based on that warning).  Defendants did not follow that tried and true formula to terminate Jarvis.

The Court therefore turns to the authorized causes in the employment agreement. Section 5.2(b) of the employment agreement provides that Jarvis may be fired immediately for cause and defines the following as "causes:"

    (i)     An act of theft, fraud, embezzlement, or intentional and material disloyalty or dishonesty with respect to the company;
    (ii)    An act of willful misconduct;
    (iii)   Intentional negligence in performing stated duties;
    (iv)   Violation of any law, rule, or regulation applicable to the business of Arsenal;
    (v)    Material breach of any provision of the signed agreements.

By specifying these five "causes," the contract precludes any other reason from being a "cause" for termination. *See Avis Rent A Car Sys., Inc. v. Heilman*, 876 So.

2d 1111, 1122 (Ala. 2003) (applying the canons *noscitur a sociis* and *ejusdem generis* in the context of contractual interpretation); *Beckman v. Cybertary Franchising LLC*, 424 P.3d 1016, 1029 (Utah App. 2018) ("the Employment Agreement [in this case] narrowed the scope of permissible bases for termination to those specifically identified").

Defendants sent Jarvis a termination letter that said the reasons for his termination included, but were "not limited to," (i) advising captive clients to shut down their captives, (ii) using confidential information to promote JarvisTower, and (iii) holding out JarvisTower as a direct competitor to Arsenal. The Court has already found that the facts do not support these three charges.

At trial, Defendants gave another reason for terminating Jarvis: insubordination.  It is clear from the record and the submissions at trial that Jarvis believed himself to be the captain of his ship.  Jarvis referred to himself as the "rising tide [that] raises all boats."  He expressed to Chandler that "[i]f [Taylor and Johnson] are going to attempt to micromanage me…this isn't going to end well."  Jarvis gave the distinct impression that he saw himself as an equal to Taylor, Chandler, and Johnson, instead of an employee.

But Defendants never told Jarvis to do something that he refused to do. *Contra Payne v. Dir. of Dep't of Indus. Relations*, 405 So. 2d 1322, 1323 (Ala. Civ. App. 1981) (finding refusal by an employee to operate a machine is insubordinate

misconduct); *Kelly v. Pate*, 668 So. 2d 32, 34 (Ala. Civ. App. 1995) (denying unemployment benefits where employee, after receiving oral and written warnings regarding sexual harassment, repeatedly harassed other employees in the same fashion). The closest Defendants ever came to directing Jarvis to do anything was the following email that Chandler sent Jarvis about a negligent fictional employee.

> What if...JarvisTower hired an employee (let's call him Plummer) and that employee had specific duties for JarvisTower…Eventually JarvisTower says, "Hey, we need you to do the job we hired you to do." So Plummer goes out and does some work related to his duties at JarvisTower. However, in the course of doing this, Plummer…does no promotion of JarvisTower.  When JarvisTower says, "Hey, we are paying you to perform duties for JarvisTower, not your own company." Plummer responds…"What does it matter how we get new captives as long as we get there? It'll ultimately be good for everyone involved."… Chris, in all due respect, it seems clear to all of us that your intentions are to promote your own company. That's fine. However, we don't need to continue to pay someone that isn't going to perform the duties that we have all agreed that you would do. If you aren't going to perform your duties as directed, we will be left with no other choice.

When Jarvis responded that he had not been given a job description or transition plan and that he would be eager to see a list of goals and expectations, Chandler simply forwarded him a copy of the marketing plan that Jarvis had designed and Defendants had approved with few comments.

If anything, this email shows that Jarvis was adequately subordinate.  Even in his analogy, Chandler concedes that Jarvis has procured new captives for Arsenal, his primary duty.  The point Chandler misses with his analogy is that, according to multiple communications between himself and Jarvis as well as the marketing plan

66

that he forwarded, a primary purpose of JarvisTower was to refer business to Arsenal.  In promoting JarvisTower, Jarvis was executing a plan that had already been discussed and approved. Jarvis was undoubtedly difficult to manage, but there is no evidence that he was insubordinate.

                b. <u>Jarvis never earned a salary under the terms of the employment agreement</u>.

Because Jarvis was terminated without cause, he may be due severance pay. The amount of severance pay is laid out at section 5.4 of the employment agreement. Section 5.2(a) of the employment agreement allows Defendants to terminate Jarvis without cause and, if they do, requires them to pay a monthly payment until the end of the term equal to Jarvis's average monthly salary in 2017 under section 3.1(c). That section provides that Jarvis will receive, every month, $833.33 per captive originated by him after the effective date of the acquisition "if and only if" Jade Risk was managing thirty-six captives when the salary came due.

Defendants argue that Jarvis never earned a salary under the terms of section 3.1(c) of the contract because there were never thirty-six captives under management as defined by the contract. Accordingly, Defendants argue that Jarvis's "average monthly salary" was zero. The Court gave Jarvis an opportunity to argue at trial and in post-trial briefing that he earned a salary under section 3.1(c) of the contract.  He chose not to do so.  Instead, Jarvis has consistently argued that, because he was paid

$15,000 per month in 2017, $15,000 is necessarily his "average monthly salary" for the purposes of computing severance.

The Court disagrees with Jarvis for two reasons.

First, the Court finds as fact that these payments were simply a continuation of the monthly salary that Jarvis was paid in 2016 and that Jarvis's salary was never reassessed under the actual terms in the agreement. Evidence at trial established that Defendants were not even familiar with the contractual provisions that governed Jarvis's salary in early 2017. For example, Chandler sent an email at the beginning of 2017 in which he told Jarvis that Chandler (erroneously) believed Jarvis's salary would *continue* at $15,000 because there were *fewer* than thirty-six captives under management.  In fact, the plain text of the contract (everyone now agrees) establishes that a condition of Jarvis earning any salary was the existence of thirty-six captives under management.  As a factual matter, the $15,000 per month payments were not based on the contract.

Second, "average monthly salary" is a defined term in the contract and must be calculated on that basis. The contract provides a severance that "is equal to the average monthly salary in Section 3.1(a) or 3.1(c), whichever is applicable, during the year of the termination of the Term, subject to satisfaction of the conditions set forth in   Section 3.1(b)." Accordingly, one must look to section 3.1(c), which governs Jarvis's 2017 salary, to determine the appropriate severance amount.

Jarvis argues that "average monthly salary" means whatever he was paid, even if the contract did not require the payments. But that argument makes no sense. A counterfactual hypothetical proves this point. Assume that Defendants had owed Jarvis $20,000 a month in 2017 under the contract, paid him $5,000 a month, and had fired him without cause. They would not have been able to avoid severance pay based on his "average monthly salary" of $20,000 simply because they never in fact paid him that amount. The converse is true here: the mere fact that Defendants erroneously paid Jarvis $15,000 a month in 2017 does not establish that he is due severance pay in that amount. The terms of the contract govern.

The record establishes that Jade Risk did not have thirty-six captives under management in 2017. That fact makes Jarvis's "average monthly salary" zero under the employment agreement. Under section 1.2 of the contract, Jarvis' employment term was to be sixty months beginning on the effective date, which was July 2016. Defendants fired Jarvis after ten months, but they owe him zero dollars (0 x 50) in severance.

*          *          *

The Court finds that TaylorChandler breached the employment agreement. Section 8.2 of the employment agreement provides that, in the event of litigation, the loser will pay the winner's "costs and expenses (including attorney's fees)."

Accordingly, Jarvis is due to receive deferred salary, bonuses, and his expenses and attorneys' fees for litigating this action.

**B. Breach of the Membership Purchase Agreement and Promissory Note (Count VI) – Defendants breached the membership purchase agreement and promissory note by failing to pay the balance of the purchase price.**

It is undisputed that Jarvis has not been paid the $750,000 owed under the promissory note. Again, "in order to recover on a breach-of-contract claim, a party must establish: (1) the existence of a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) damages." *Capmark Bank v. RGR, LLC*, 81 So. 3d 1258, 1267 (Ala. 2011). It is undisputed that the contract is valid. It is undisputed that Jarvis performed his obligations under the note, which are separate from the employment agreement, and it is undisputed that Defendants have refused to pay the note. The only question is how much of the note must be paid.

Under the membership purchase agreement, the amount owed under the promissory note is reduced by the lesser of either the "2016 Revenue Shortfall" or the "2017 Revenue Shortfall." The agreement provides that, if Jade Risk generates less than $1,010,000 in revenue between July 1, 2016 and December 31, 2016, then there would be a 2016 revenue shortfall. The 2017 revenue shortfall is defined as "$3,260,000 minus the cash revenues received by the Company for the period between July 1, 2016 and December 31, 2017 plus the outstanding accounts

receivable as of December 31, 2017." The principal of the note is reduced by the smaller of the two differences between the actual revenues generated and the target revenues. Because Jarvis was fired only five months into 2017, the 2017 shortfall is presumably far in excess of the 2016 shortfall. Accordingly, the parties agreed during trial that the 2016 revenue shortfall is the only potential shortfall at issue.

The parties disagree over the accounting method to calculate revenue. Defendants calculate 2016 revenue using the cash basis method, which counts revenue when cash is received. Plaintiff calculates it using the accrual method, which counts revenue when the services that generated the revenue are performed. The parties each submitted expert testimony on this point.[15] The Court concludes that, on the facts of this case, the cash basis method is most appropriate.

This is so for two alternative reasons.

First, the parties' course of conduct and expectations establish that revenue should be calculated based on cash received during 2016, not obligations accrued during 2016. The term "2016 revenue" is ambiguous because it is reasonably susceptible to two or more meanings, such that parol evidence is appropriate to assist

---

[15] Defendants filed a motion to exclude opinions by Plaintiff's expert Gary Bowers under Rule 702, which the Court held in abeyance until after trial. *See* Doc. 145. Bowers is unquestionably qualified to opine on Generally Accepted Accounting Principles as well as the captive insurance industry. Bowers has been a CPA since 1981 and earned a Masters in Taxation from Georgia State University. He spent more than a decade as the managing partner of the tax group at Johnson Lambert, one of the leading specialty CPA firms for the insurance industry, and was actively involved with the firm's captive work for seventeen years. Defendants motion is denied, and Bowers's testimony will be considered.

in its interpretation. *See State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 308–09 (Ala. 1999); *McClendon v. Eubanks*, 30 So. 2d 261, 268 (Ala. 1947).   Evidence at trial unequivocally establishes that the parties intended revenue to be calculated based on cash received. Jade Risk used the cash basis method of accounting. Jarvis executed a version of the employment agreement that contained an extra subsection, 3.1(b)(vii), titled "Calculation of Revenue During Initial Term," which expressly provided that cash basis be used to determine revenue.   And Taylor and Chandler testified that they thought this section was included in the version they signed.

Second, were the contract unambiguous, the Court would conclude that the cash basis method is the correct way to calculate 2016 revenue. Under Alabama law, the words of an agreement are to be given their ordinary meaning, and the intention of the parties is to be derived from the provisions of the contract. *Smith v. Citicorp Person-to-Person Financial Centers, Inc.*, 477 So.2d 308, 310 (Ala. 1985). Revenue, as defined by any dictionary, is the total cash produced by a company's sales or other activities. "2016 revenue" would naturally mean the total cash realized during that calendar year. Only under a specialized definition could one conclude that a company's "2016 revenue" includes money that is not realized in 2016.

Plaintiff's expert declined to provide a cash basis calculation for the Court. Accordingly, the best evidence on point comes from Defendants' expert, who calculated revenue for 2016 under the cash basis method at $772,286.88. When this

figure is subtracted from $1,010,000, it results in a revenue shortfall of $237,713.12.

When this figure is subtracted from $750,000, the result is $512,286.88.  Therefore,

the Court finds that Defendants owe Jarvis $512,286.88 plus all applicable interest.

### C. Declaratory Judgment About the Promissory Note (Counts VII and VIII) – The requested relief has already been provided.

If the Court is unwilling to find that Defendants breached the promissory note,

Jarvis asks in Count VII that the Court find they anticipatorily breached it. If the

Court finds neither that they breached nor anticipatorily breached, Jarvis asks in

Count VIII that the Court award him the money owed under the promissory note less

the Defendants' calculated revenue shortfall. These counts are dismissed as moot in

light of the Court's ruling on Count VI.

### D. Civil Conspiracy (Count X) – Defendants did not have the coordination or ability to conspire.

Jarvis alleges that all Defendants wrongfully conspired together to commit

each of the wrongful acts alleged.  *See* Doc. 82 at ¶102.  "The elements of civil

conspiracy in Alabama are: (1) concerted action by two or more persons (2) to

achieve an unlawful purpose or a lawful purpose by unlawful means."  *Ex parte*

*Alamo Title Co.*, 128 So. 3d 700, 713 (Ala. 2013).  Although the Court finds that

Defendants breached the employment agreement and promissory note, the trial made

clear that there was no conspiracy to do so. Even had there been, this right of action

is not cognizable under the intracorporate conspiracy doctrine.

Defendants never conspired to wrongfully harm Jarvis. Jarvis claims that all three individual defendants wrongfully conspired to terminate him without cause and refuse to pay him compensation, either in salary or as part of the promissory note. His theory is that they formed this conspiracy to rid themselves of the bad deal that they had signed. Instead, the Court finds that Defendants fired Jarvis because they did not want to work with him as an employee. They did not trust him, and they had trouble managing him. Having observed the key players at trial, it is obvious to the Court that Defendants—or any other group of conservative accountants—would have difficulty employing someone like Jarvis. Defendants may have caused their company to breach the terms of the contract when they fired Jarvis, but they did not commit a tort, and they did not do so with bad intentions.

Even if Jarvis had proved that Defendants wrongfully conspired to harm him, any allegation of conspiracy in this case would be foreclosed by the intracorporate conspiracy doctrine. This doctrine has been fully embraced by the Eleventh Circuit:

> [under the doctrine] acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves.

*McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc). The Alabama Supreme Court has adopted the intracorporate conspiracy doctrine. *See M & F Bank v. First Am. Title Ins. Co.*, 144 So. 3d 222, 234 (Ala.

2013) (citing *McAndrew*). The action of Taylor, Chandler, and Johnson in firing Jarvis was well within the scope of their employment duties as the three leaders of TaylorChandler and Arsenal. Accordingly, Plaintiff's civil conspiracy count will be dismissed.

## **CONCLUSION**

There was a lot of testimony during the trial about the captive management industry and best practices in creating and maintaining such insurance companies. The Court appreciated that testimony—it was very interesting—but it was not especially relevant. This case is ultimately about written agreements that memorialized an arms-length deal between sophisticated parties. The Court concludes that Jarvis substantially performed the contracts he signed with Defendants, and they were never excused from their payment obligations under the employment agreement and promissory note.

A separate order will be entered consistent with this memorandum opinion on the various pending motions. Three issues remain to be resolved: Defendant's spoliation sanctions, Jarvis's costs and attorneys' fees, and prejudgment interest. After these issues are addressed, the Court will enter a final judgment as a separate document that (1) awards Jarvis $175,000 in deferred salary from TaylorChandler, $160,000 in captive origination bonus payments from TaylorChandler, $512,286.88 in promissory note payments from individual Defendants Taylor, Chandler, and

Johnson, and appropriate prejudgment interest; (2) requires Jarvis to render unto TaylorChandler the MacBook Pro laptop or its value in 2017; (3) awards spoliation sanctions to all Defendants in the amount of attorneys' fees and expenses expended to develop and litigate the spoliation issue; and (4) awards Jarvis his attorneys' fees and expenses in litigating this action.

**DONE** and **ORDERED** this 19th day of August 2020.

/s/ Andrew L. Brasher
ANDREW L. BRASHER
UNITED STATES CIRCUIT JUDGE
(sitting by designation)